**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Richard Cleve BROWN,
Defendant-Appellant.**

**No. 75–1816.**

United States Court of Appeals,
Tenth Circuit.

Submitted July 28, 1976.

Decided Aug. 23, 1976.

Robert Bruce Collins, Asst. U. S. Atty., Albuquerque, N. M. (Victor R. Ortega, U. S. Atty., and Mark C. Meiering, Asst. U. S. Atty., Albuquerque, N. M., on the brief), for plaintiff-appellee.

Harold H. Parker, Albuquerque, N. M., for defendant-appellant.

Before SETH, BARRETT and DOYLE, Circuit Judges.

BARRETT, Circuit Judge.

Richard Cleve Brown appeals from his jury conviction following trial on a two count Indictment charging that he did, on or about July 18, 1975, at Albuquerque, New Mexico, (1) by force and violence and intimidation, wilfully and knowingly, by the use of a pistol, take from the persons of two bank tellers at the Security Federal Savings and Loan Association, an FSLIC institution, the approximate sum of $1,397.00 in violation of 18 U.S.C.A. § 2113(a) and (d) and (2) take and carry away with intent to steal the approximate sum of $1,397.00 in violation of 18 U.S.C.A. § 2113(b).

On appeal, Brown urges reversal on the grounds that: (1) his confession was the product of a threat by FBI agents that they would arrest his girlfriend and that it should have been excluded; (2) the trial court erred in refusing to allow him to call witnesses in his own behalf by its refusal to allow his expert witness to testify relative to the limitation and weakness of eye-witness identification; (3) the trial court erred in refusing to allow him to cross-exam FBI agents or to call them as his witnesses relative to the weakness of eye-witness identification, constituting a refusal to allow him to confront the witnesses against him or to call witnesses in his own behalf; (4) the trial court erred in admitting the fruits of an illegal search, made without benefit of arrest or search warrants even though there was adequate time to secure them; (5) the Government failed to prove the institution allegedly robbed was a federally insured institution, thus failing to meet its jurisdictional obligation; and (6)

that the FBI agents' "burst" into Brown's apartment was made forcibly and illegally without warrant or consent and that his subsequent arrest was illegal.

Our review of the evidence shall, of course, be recited in the light most favorable to the Government. On July 18, 1975, a male, described as approximately five feet ten inches in height, quite slim, with a large nose, dark hair and eyes, and a mustache while dressed in blue pants, a long-sleeved gold shirt, tan colored boots, entered the Security Federal Savings and Loan Association of Albuquerque, New Mexico, armed with a dark gray automatic pistol. Two tellers, Lynn Smith and Betty Entzian, were approached by the armed male about 3:00 P.M. that day. The only customers in the bank at the time were Mr. and Mrs. Jonte and their young son. One male customer thereafter entered the bank. The robber approached Teller Smith's counter. He stood not more than two feet from her. Smith testified that she observed him carefully. The robber inquired about opening an account and interest rates. Smith handed him some brochures about the institution which he read. He then remarked to Smith that he didn't have much money and didn't know if he trusted the bank. When the Jontes left the building, the male produced a pistol and pointed it at Smith and Entzian and he directed them not to push any buttons, to step back from their counters and hand him the money in their respective teller drawers. Both tellers testified that Government Exh. 6 appeared to them to be the same pistol used by the robber; they identified the robber in the detail previously related. The tellers further positively identified Brown in the courtroom, at trial, as the person who had robbed the bank and threatened them by use of the firearm. Both tellers stated that they were in a state of shock and fear that Brown would shoot them; that they were standing not more than three feet apart when Brown confronted them with the pistol and the demands; that Teller Entzian removed the money from her teller drawer and handed all of the bills to Brown; that some of the bills were "bait", i. e., those bearing serial numbers recorded by the bank for tracing purposes; that Brown then ordered them to move around the counter and into the bathroom, with his pistol directed at them; that he ordered them to remove their clothing and hand it to him; that after they disrobed and handed Brown the clothing, he twice told them to stay in the bathroom for five minutes. Within a few minutes the tellers came out of the bathroom. Brown had departed.

After the tellers reported the robbery to the police, they conducted an audit of the bills withdrawn from the drawer and handed to Brown, which amounted to $1,397.00. The two brochures which had been left by Brown on the counter were carefully handled, marked and sent to the Washington, D.C. FBI laboratory for fingerprint and palmprint analysis. FBI expert Douglas O. Cole testified that his process—analysis disclosed five latent fingerprints and two palmprints as those of Brown traced to one of the brochures, admitted in evidence. Photographs taken by the bank's surveillance camera, introduced in evidence, depicted a man strongly resembling Brown and the description independently given by the tellers.

David J. Weir, vice-president of the bank, testified that the bank is chartered by the United States Government as a federal savings and loan association. He produced a photocopy of the bank charter, admitted in evidence, after producing the original. Weir also produced the bank's business documents identifying the "bait" money, by serial numbers which had been handed to the robber from Teller Entzian's drawer.

On July 21, 1975, FBI agents displayed a six-photo gallery display to the two bank tellers and the bank customer, Mr. Jonte, each of whom separately and independently identified Brown as the bank robber from a photograph of him. On that same day, FBI agents were informed that several hours after the bank robbery, Brown and his girlfriend, Sylvia McKinney, had negotiated for the purchase of a car at a car lot in Albuquerque and that both had returned to the lot the following morning with currency

which they used for the purchase of a 1965 Chevrolet Impala. The agents found the vehicle parked in front of McKinney's apartment in Albuquerque on July 21, 1975. That same day, two of the $20.00 "bait" bills were traced to the currency paid by Brown to Bill Mace and Red Roach Auto Sales when he acquired the car, and FBI agents obtained Brown's address which proved to be that of Sylvia McKinney's apartment.

The Albuquerque Police Department was on strike. Seven FBI agents immediately proceeded to the address. Sylvia McKinney answered the agents' knock at her front door. The agents identified themselves and informed McKinney that they were looking for Brown. McKinney did not respond. She became distraught and moved from the door toward another room. Agent Harrison observed a man running by the front door and into a room. Agent Bloom then entered the apartment through the front door and walked to the room McKinney had been seen walking toward. Inside the room, Bloom saw: a man identified as Arturo Lucero standing near a bed; a twenty-five calibre automatic pistol, fully loaded, on a dresser (which matched the description of the pistol related by the bank tellers); narcotics and narcotics paraphernalia on the dresser; and a pair of boots protruding from beneath the bed. Bloom then found Brown hiding under the bed. Bloom immediately advised Brown of his rights and turned him over to Agent Behrenz. Local authorities were contacted relative to the narcotics discovery insofar as McKinney and Lucero were involved. Due to the strike the FBI agents, upon request, transported McKinney and Lucero to the local police authorities. Brown asked FBI agents about McKinney. He was informed that she had been taken to the Albuquerque police station, probably there to be charged with possession of narcotics and narcotics paraphernalia. Brown told the agents that the narcotics and narcotics paraphernalia were his and that he would consider talking to the agents if McKinney were brought back to the apartment to be present during the interview. Agent Behrenz agreed to

have McKinney returned to the apartment. He then again advised Brown of his rights, using the standard FBI waiver of rights form. After McKinney was returned to the apartment, Brown confessed to the robbery.

## I.

Brown contends that his confession was the product of a threat by the FBI agents that they would arrest his girlfriend (McKinney) and that, accordingly, it should have been excluded. We disagree.

Brown had a substantial educational background in the area of criminal justice. He was thoroughly familiar with his rights against self-incrimination and illegal searches, seizures and arrests. When asked, following his arrest, by FBI Agent Bloom whether he understood his rights after having been orally advised thereof, Brown replied "I know my rights". [T.R. Vol. II, p. 20]. After reading the complete waiver form presented to him by Agent Behrenz, Brown did not ask for counsel or in anywise indicate a reluctance to confess.

After his arrest, Brown inquired of the FBI agents whether Sylvia McKinney had been arrested. He was told that she had been arrested relative to the narcotics and because she was considered a suspect in the bank robbery as an aider and abettor. It was then that Brown commented that McKinney had nothing to do with the narcotics or the bank robbery and that if she were returned to the apartment he would talk to the agents about the bank robbery in her presence. Brown's testimony, refuted entirely by FBI agents, given at the hearing on his motion to suppress his confession, was that the agents stated that if he had any consideration for his girlfriend (McKinney), he would clarify her position and that if he did not do so, the Government would have no choice but to consider her a possible suspect for aiding and abetting in the robbery. Brown contends that these alleged FBI remarks rendered his confession involuntary in that they were coerced in both a psychological and emotional sense out of his sympathy and con-

cern for McKinney. The trial court denied the Motion to Suppress, finding that the confession had been voluntarily given. We hold that there is substantial evidence in support of the trial court's finding.

No challenge is raised by Brown that he did not understand the *Miranda* warnings or that they were improperly given. The issue, then, is whether, under all of the circumstances, Brown's confession was voluntary. The test in determining whether a confession is voluntary is whether it was in any way coerced so as not to be the product of the free, independent will of the confessor. *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Blackburn v. Alabama*, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); *United States v. Ireland*, 456 F.2d 74 (10th Cir. 1972); *Bell v. Patterson*, 402 F.2d 394 (10th Cir. 1968), cert. denied 403 U.S. 955, 91 S.Ct. 2279, 29 L.Ed.2d 865 (1971).

The record does not reflect, viewing the evidence in the light most favorable to the Government, as we must, that Brown's confession was the result of any lies, promises or tricks. In truth, the record reflects that FBI agents were scrupulously honest in responding to Brown's inquiries about Sylvia McKinney. The totality of circumstances justifies the trial court finding that Brown's confession was a product of his free will and voluntary choice. The Government overwhelmingly met its countervailing burden of proving Brown's voluntary waiver of his constitutional privilege against self-incrimination following Brown's testimony in support of his motion to suppress. *United States v. Crocker*, 510 F.2d 1129 (10th Cir. 1975); *Nolan v. United States*, 423 F.2d 1031 (10th Cir. 1969), cert. denied 400 U.S. 848, 91 S.Ct. 47, 27 L.Ed.2d 85 (1970). Brown's confession was voluntary; it is not barred by the Fifth Amendment. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966); reh. denied, 385 U.S. 890, 87 S.Ct. 11, 17 L.Ed.2d 121 (1967). Brown did not confess out of fear for the welfare of McKinney. The confession was not induced by FBI threats rendering it inadmissible.

*Lynumn v. Illinois*, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963).

II.

Brown argues that the trial court erred in refusing to permit his expert witness to testify to the limitation and weakness of lay eye-witness identification. We disagree.

The proffer was made by Brown after the two bank tellers and bank customer Jonte identified him as the robber following a photograph gallery-display of six photographs three days after the robbery and in person at trial. The expert Brown offered is Henry C. Ellis, a psychologist at the University of New Mexico, who had conducted studies of eye-witness identification and problems of perception. After the court sustained the Government's objection to the admission of Dr. Ellis' testimony, counsel for Brown made what he considered to be an offer of proof by simply stating to the court that which counsel represented Dr. Ellis would testify to. Such is simply not an offer of proof.

Ordinarily the admission of any expert testimony is within the discretion of the trial court. *Wolford v. United States*, 401 F.2d 331 (10th Cir. 1968) and cases cited therein. It is fundamental that the testimony of witnesses, both in civil and criminal cases, is admissible if predicated upon concrete facts within their own observation and recollection—that is, facts perceived from their own senses, as distinguished from their opinions or conclusions drawn from such facts. Wigmore on Evidence, Third Ed., Vol. VII, §§ 2078 through 2081; 31 Am.Jur.2d, Expert and Opinion Evidence, § 2. The significance of eye-witness testimony in the case at bar is obvious. The burden of proof rests upon the prosecution in a criminal case to establish beyond a reasonable doubt all elements of the offense charged, including, where it is essential to his guilt, the defendant's presence at the time and place of the commission of the crime. *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), reh.

denied 338 U.S. 839, 70 S.Ct. 31, 94 L.Ed. 513 (1949); 46 A.L.R.2d 1169; 29 Am. Jur.2d, Evidence, § 151.

 The identity of persons may be established in various ways, and considerable latitude is permitted the trial court in the admission of evidence relative thereto. 29 Am.Jur.2d, Evidence, §§ 367, et seq. The general rule is that a person of ordinary intelligence, who qualifies to testify upon the subject by showing that he had the opportunity for personal observation, may give opinion testimony as to a person's identity from any fact that leads him to believe that he knows the identity of the person in question. 29 Am.Jur.2d, Expert and Opinion Evidence, § 122; 86 A.L.R.2d 728, § 2. A witness must ordinarily confine his testimony to matters within his actual knowledge, i. e., perception of fact by the senses. 31 Am.Jur.2d, Expert and Opinion Evidence, § 2; 77 A.L.R. 553.

 Generally, expert testimony, while not limited to matters of science, art or skill, cannot invade the field of common knowledge, experience and education of men. 31 Am.Jur.2d, Expert and Opinion Evidence, § 21; 100 A.L.R.2d 1421; 92 A.L.R. 1223. Put another way, the test of admissibility is often predicated upon the proposition that opinion evidence cannot usurp the functions of the jury or be received if it touches the very issue before the jury. *Frase v. Henry*, 444 F.2d 1228 (10th Cir. 1971); Wigmore on Evidence, Third Ed., Vol. VII, §§ 1920, 1921; 31 Am.Jur.2d, Expert and Opinion Evidence, § 22.

When an expert, such as a qualified psychiatrist, has been offered as a witness following detailed examinations and tests relative to a defendant's competency, in order to testify that the defendant, within the factual situation of the case, would have signed a document placed before him by the police regardless of its truth or falsity, such a tender has been consistently refused on the basis that it constitutes a clear invasion of the province of the judge and the jury. *United States v. Spaulding*, 293 U.S. 498, 55 S.Ct. 273, 79 L.Ed. 617 (1935); *Miller v. Pate*, 300 F.2d 414 (7th Cir. 1962); cert.

denied 371 U.S. 898, 83 S.Ct. 193, 9 L.Ed.2d 131 (1962); *United States v. Roberts*, 192 F.2d 893 (5th Cir. 1951).

In *United States v. Brown*, 501 F.2d 146, 150 (9th Cir. 1974), reversed on other ground, *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (decided June 23, 1975), the Court said:

Nobles offered the testimony of Dr. Robert Buckhout as an expert witness to describe the problems of eyewitness identification in general and the specific difficulties with the identifications in this case. The court refused the proffered testimony, concluding that the testimony would invade the province of the jury, that the undue consumption of time would substantially outweigh its probative value, and that the offer of proof was inadequate. We in turn cannot conclude that the trial court was in error. *United States v. Amaral*, 488 F.2d 1148 (9th Cir. 1973).

 We, too, cannot conclude in the case at bar that the trial court erred.

### III.

Brown argues that the search of McKinney's apartment was illegal because there had been no arrest or search warrants even though there was adequate time to obtain them, thus violating his Fourth Amendment rights.

 We hold that the facts we have heretofore related in detail fully justify both the warrantless arrest and search. The fact that the arrest and subsequent consensual search took place in the "home" or apartment of Sylvia McKinney does not lessen their justification based upon the exigent circumstances then existing coupled with the overwhelming factual basis establishing probable cause. On July 21, 1975, less than three days after the robbery, FBI agents learned: of Brown's identification by the two bank tellers and the bank customer; the similarity of the person reflected in the bank's surveillance camera to Brown; that Brown in the company of his girlfriend had purchased a car with curren-

cy which included some of the bank's bait money; and that Brown's address given at the car lot was that of Sylvia McKinney. Under these circumstances, the agents were justified in proceeding immediately to the address given without the benefit of warrants. They located the recently purchased vehicle adjacent to McKinney's apartment. They knocked on her apartment door, identified themselves and announced the purpose of their call. McKinney responded by fleeing to a bedroom. The agents then saw a man rush past the front door and enter another room. Notwithstanding the existence of these facts, Brown nevertheless argues the proposition that the Government has not shown, in fact, the existence of exceptional or exigent circumstances justifying the arrest and subsequent search made without the benefit of warrants issued within the judicial process. The FBI agents, it is contended, had adequate time to obtain the warrants. In addition, Brown stresses that the warrantless arrest and search were conducted in a private home where a person has a reasonable expectation of privacy. He places particular emphasis upon the concurring opinions of Mr. Justice Powell and Mr. Justice Stewart in *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). The opinion for the plurality was authored by Mr. Justice White. Contrary to Brown's contention, we believe that opinion is solid justification for the warrantless arrest and search made in the case at bar. In *Watson*, the Court reiterated the rules laid down in *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975): that the lawfulness of an arrest without warrant must be based upon probable cause; that while protection of individual rights could be assured by requiring a magistrate's review of the factual justification prior to any arrest, that such a requirement could constitute an intolerable handicap for legitimate law enforcement; and that no arrest has been invalidated by the Supreme Court supported by probable cause solely because the officers failed to secure a warrant. We agree that *Watson* acknowledges that the Supreme Court has not yet specifically dis-

posed of the issue whether and under what circumstances an officer may enter *a suspect's home* to make a warrantless arrest, we have no hesitancy in holding that the arrest and subsequent search, in the instant case, both undertaken without the benefit of warrants, were constitutionally valid and justified. There were "exigent circumstances" justifying substitution by the FBI agents' judgment as to probable cause for Brown's arrest in lieu of that of a judicial official. The quick emergence of facts which blended on July 21, 1975, concentrated directly on Brown. The fact that an automobile had been acquired by Brown (paid for in cash) just two days before was justification for *immediate* action by the agents in converging at McKinney's apartment where they discovered the vehicle. The suspicious activities at the doorway, combined with the previously acquired information, met fully the probable cause requirement justifying the agents' entrance into McKinney's apartment for the purpose of discovering and arresting Brown. In determining whether an arrest or search warrant should have been obtained, we must evaluate the circumstances as they would have appeared to prudent, cautious and trained officers. *United States v. Miller*, 460 F.2d 582 (10th Cir. 1972); *Trusty v. State of Oklahoma*, 360 F.2d 173 (10th Cir. 1966); *Murray v. United States*, 351 F.2d 330 (10th Cir. 1965), cert. denied 383 U.S. 949, 86 S.Ct. 1207, 16 L.Ed.2d 211 (1966).

Brown would have us employ hindsight— based upon an assumption he advances, i. e., that he did not plan an immediate or imminent departure in the automobile—in evaluating the actions of the agents in support of his contention that they had adequate time to secure both arrest and search warrants. This we refuse to do.

■ In relation to the search conducted by the agents, Brown has failed to point out that the District Court found, based upon substantial evidence, that Sylvia McKinney voluntarily signed a consent to search document provided her by the FBI agents after she had been informed that she had a right to refuse them such permis-

sion to search her apartment. It is fundamental that no warrant is required if a person having custody or control of the premises consents to the police search. McKinney's consent effectively denied Brown any Fourth Amendment rights he may have had to challenge a warrantless search. Furthermore, Brown's failure, at trial, to object either to the admission in evidence of the pistol or the gold shirt found in McKinney's apartment as a result of the search constitutes a waiver, absent plain error. Where no objection is made at trial to the admission of evidence, the alleged error is not preserved for appellate review unless its admission constitutes plain error. *Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); *United States v. DeLuzio*, 454 F.2d 711 (10th Cir. 1972), cert. denied 407 U.S. 922, 92 S.Ct. 2467, 32 L.Ed.2d 808 (1972); *United States v. Wheeler*, 444 F.2d 385 (10th Cir. 1971); *United States v. Adams*, 422 F.2d 515 (10th Cir. 1970), cert. denied 399 U.S. 913, 90 S.Ct. 2213, 26 L.Ed.2d 569 (1970); *Williams v. United States*, 323 F.2d 90 (10th Cir. 1963), cert. denied 376 U.S. 906, 84 S.Ct. 659, 11 L.Ed.2d 605 (1964); *Matthews v. United States*, 407 F.2d 1371 (5th Cir. 1969), cert. denied 398 U.S. 968, 90 S.Ct. 2177, 26 L.Ed.2d 554 (1969).

 The evidence is conflicting on the issue of the voluntariness of Sylvia McKinney's consent to search. The able trial judge chose to believe the testimony of the FBI agents on this issue. We accept his choice.

The managers of the apartment building which included McKinney's apartment informed the FBI agents that the apartment was rented to Sylvia McKinney. Before McKinney was removed from the apartment, she was fully orally advised of her rights relative to a search of the apartment. In addition, a printed form advising McKinney of her rights was presented to her by FBI agent Zumpf, and read to her by him. McKinney carefully read and signed the consent to search portion of the form in the presence of Agents Bloom and Zumpf, both of whom witnessed her signature.

We believe that a strong contention may be made in this case that a warrantless search would have been justified based upon and incident to the valid warrantless arrest. Further, it appears from the record that at the time of Brown's arrest, the automatic pistol and the tan boots worn by Brown were in "plain view" and that, accordingly, they were not discovered or detected by reason of a search.

Sylvia McKinney testified that she met Brown while he and her husband, Grant, were inmates in prison and that she had been living with Brown after he was paroled on May 12th. She stated that she was living with her husband, Grant, prior to and at the time of trial. He had been released from prison after Brown's arrest at her apartment. She acknowledged that she was on probation from the states of Arizona and New Mexico stemming from narcotics charges. There was no evidence offered by the defense that anyone other than Sylvia McKinney paid the apartment rental or claimed control over the premises.

In *Wren v. United States*, 352 F.2d 617 (10th Cir. 1965), cert. denied 384 U.S. 944, 86 S.Ct. 1469, 16 L.Ed.2d 542 (1966), this Court said:

> In order to constitute a voluntary consent it must clearly appear that the search was voluntarily permitted or expressly invited and agreed to by the person whose right is involved. In addition, such person must be cognizant of his rights in the premises, the consent must not be contaminated by any duress or coercion and the government has the burden of proof. The question of whether consent has been given is a question of fact for the trial court to determine in accordance with the foregoing accepted principles of law and subject to appellate review within the "clearly erroneous" rule.

352 F.2d at 618.

 We recognize that Brown has standing to challenge the legality of the search as a "person aggrieved" under Rule 41(e) of the Federal Rules of Criminal Procedure because he was lawfully on the

premises as an invitee of McKinney. *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Villano v. United States*, 310 F.2d 680 (10th Cir. 1962). This Court and other courts have held, however, that the challenge of Brown and others similarly situated cannot prevail against a voluntary consent to search granted by a lessee, such as McKinney, who has possession and control of the premises. *Leeper v. United States*, 446 F.2d 281 (10th Cir. 1971), cert. denied 404 U.S. 1021, 92 S.Ct. 695, 30 L.Ed.2d 671 (1972). *See also Burge v. United States*, 342 F.2d 408 (9th Cir. 1965), cert. denied 382 U.S. 829, 86 S.Ct. 63, 15 L.Ed.2d 72 (1966). In so holding, we did no more—and perhaps less—than the courts who rendered decisions invoking the rule that consent granted by the wife to search the home is binding on her husband or that consent of parents to search the home is binding on their son. *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Roberts v. United States*, 332 F.2d 892 (8th Cir. 1964), cert. denied 380 U.S. 980, 85 S.Ct. 1344, 14 L.Ed.2d 274 (1965); *Rees v. Peyton*, 341 F.2d 859 (4th Cir. 1965). One who has possession and control of the articles seized or the premises on which they were found may consent to a search which produces incriminating evidence against someone else. *Leeper v. United States, supra; United States v. Sferas*, 210 F.2d 69 (7th Cir. 1954), cert. denied 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086 (1954); *United States v. Eldridge*, 302 F.2d 463 (4th Cir. 1962). The search in the case at bar was not violative of Brown's Fourth Amendment rights.

### IV.

We have reviewed each of Brown's remaining contentions. We hold that they are without merit.

WE AFFIRM.