Marvin T. GATES, Executor of the estate of Fae L. Gates, Deceased, and Marvin T. Gates, individually, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

No. 81–1319.

United States Court of Appeals, Tenth Circuit.

May 10, 1983.

Leo H. Whinery, Norman, Okl. (Ed Abel, Oklahoma City, Okl., with him on the briefs), of Abel, Musser, Sokolosky & Clark, Oklahoma City, Okl., for plaintiffs-appellants.

Jeffrey Axelrad, Director, Torts Branch, Washington, D.C. (Stuart E. Schiffer, Acting Asst. Atty. Gen., and Thaddeus B. Hodgdon, Atty., Dept. of Justice, Washington, D.C., and David R. Russell, U.S. Atty., W.D. Okl., Oklahoma City, Okl., with him on the brief), for defendant-appellee.

Before BARRETT, McKAY and LOGAN, Circuit Judges.

PER CURIAM.

This is an appeal from the judgment of the district court dismissing plaintiff's action against the United States for personal injury allegedly caused by the swine flu vaccination administered during the National Swine Flu Immunization Program of 1976, 42 U.S.C. § 247b(j)–(l) (1976) ("Swine Flu Act"). The sole issue was whether the swine flu vaccine received by plaintiff (Fae L. Gates) was the proximate cause of the Guillain-Barre Syndrome [1] ("GBS") she suffered in the fall of 1977. The district court held that plaintiff had failed to prove causation by a preponderance of the evidence.

The action was brought under the Swine Flu Act by Marvin T. Gates and Fae L. Gates in the United States District Court for the Western District of Oklahoma. The Swine Flu Act provides that the United States shall generally be liable for injuries arising out of administration of the swine flu vaccine and that swine flu actions are deemed to be actions brought under the Federal Tort Claims Act, ("FTCA"). 42 U.S.C. § 247b(k)(2)(A).

Before trial, the parties stipulated that plaintiff had GBS. According to the Final Pretrial Order, she did not have to establish a theory of liability to win her case; she had only to prove the existence of a causal nexus between the swine flu vaccination and her GBS.

In advance of trial, the district court appointed a panel of three medical experts to assist the court in resolving the complex medical issues involved. The panel submitted its findings to the court in a report which was admitted into evidence. At trial, the district court heard testimony from plaintiff's witnesses, expert and lay, and considered the depositions and exhibits offered by both plaintiff and defendant. Among the exhibits was a report prepared by researchers at the Center for Disease Control ("CDC") consisting of epidemiological data based on a nationwide survey after the Swine Flu Program.

The case was tried without a jury; the trial court made the following findings of fact: Plaintiff, an energetic sixty-seven year old woman, received two swine flu inoculations on October 22, 1976 at a public health center in Stillwater, Oklahoma. Her second injection was administered accidentally. She was unaware of this. Her medical history prior to 1976, however, indicates that she had suffered from several ailments. In 1964 she had Meniere's Syndrome, a syndrome of the inner ear that causes hearing difficulties and disturbs one's balance. Plaintiff had hearing problems before and after her immunization; she had chronic tension with elevated blood pressure and was allergic to pollen, grass, and dust. She also had a series of operations: in 1952 several cysts were removed from her right breast; in 1967 she underwent a hysterectomy; in 1972 she had foot surgery; and in 1973 she had an appendectomy and a gall bladder operation.

Shortly after plaintiff was vaccinated, her vaccinated arm became sore and she developed a low-grade fever. About two to three weeks later, she developed shortness of breath, "shakes", and aches in her lower back and legs. In early November of 1976, plaintiff's hands became unsteady, her equilibrium was altered, and her memory began to deteriorate. In December 1976 she developed a rash on the left side of her neck. The medical records for these consultations

_____

1. Guillain-Barre Syndrome is a neurological disorder of unknown cause.

make no mention of back pain, shortness of breath or imbalance. From December of 1976 to May 1977, she did not consult a physician.

On May 2, 1977 plaintiff went to the Scott and White Memorial Hospital in Texas complaining of pain in her hips. On admission to the clinic, she reported that two months previously she had experienced low back pain. An examination revealed a swelling in her left lower back area. Reflexes were symmetrically normal at the knees and ankles and there was no weakness or paresthesias (a burning, pricking or tingling sensation) in the lower extremities. The physicians at the Scott and White Clinic noted excoriations on her neck and back, which had been present since December 1976. It was observed that these excoriations were self-induced and related to anxiety. The medical records indicate that plaintiff was overweight and had elevated blood pressure.

Based upon the May 1977 medical records from the Scott and White Clinic, all medical experts who testified, either at trial or by deposition, agreed that Ms. Gates had none of the signs or symptoms of GBS at that time.

Although plaintiff testified that her pain and weakness persisted after her visit to Scott and White, she did not consult a physician again until her admission to the Stillwater Municipal Hospital in Stillwater, Oklahoma on September 19, 1977. The final diagnosis of Dr. Frye, the admitting physician, was polyarthralgia (a severe pain in several joints, Stedman's Medical Dictionary at 124 (5th ed. 1982)). Upon admission to the hospital, plaintiff stated that she was well until September 12 when she moved to a new home. Apparently, the activity of moving caused such symptoms as aching in the lower extremities, nausea, vomitting, and difficulty in moving. After showing some improvement on September 30, plaintiff was discharged on her own request.

On October 5, 1977 plaintiff was taken by ambulance to the Scott and White Clinic. Her primary complaint was pain and weakness in her legs. A neurological examination at that time indicated normal motor strength in her upper extremities but marked weakness of the hips, knees, and ankles. Reflexes were absent at the ankles and diminished at the knees. The initial diagnosis was an ascending polyneuritis (an inflammation of a large number of the spinal nerves, *id.* at 1119).

Electrodiagnostic testing conducted at Scott and White indicated that motor nerve conduction velocity was significantly impaired in plaintiff's lower extremities but mostly normal in the upper ones. Plaintiff's cerebrospinal (relating to the brain and spinal cord, *id.* at 255) fluid protein level was significantly elevated. Plaintiff was discharged from Scott and White on October 11, 1977 with a final diagnosis of GBS.

The trial court held that plaintiff failed to prove a causal connection between the vaccination and GBS. The court relied on the report prepared by the CDC, which shows that vaccine-related GBS can occur for up to ten weeks after the vaccination. Here, the court observed, the onset of plaintiff's GBS occurred eleven months after the vaccination. The court also considered significant the finding of the panel of experts that the long delay in the onset of GBS after the vaccination extinguished any causal nexus. On March 2, 1981, the district court entered judgment in favor of the United States and dismissed the complaint. This appeal followed.

On appeal plaintiff raises the following issues:

1. Whether the trial court's appointment of a panel of experts was error;

2. Whether the trial court erred in ruling an expert opinion inadmissible;

3. Whether the trial court erred in relying on a Center for Disease Control study as being indicative of a lack of causal relationship;

4. Whether the trial court improperly interpreted and applied Oklahoma law on proximate cause;

5. Whether statistical data without independent evidence is sufficient to rebut a prima facie case.

Plaintiff's first two contentions raise issues regarding discretionary rulings by the trial court. Plaintiff challenges the makeup of the panel of experts appointed to assist the trial court because, plaintiff argues, the panel of three experts consisted of two specialists in neurology and one expert witness with a strong predilection to a neurological bias.

The panel consisted of C.H. Milliken, M.D., professor of neurology at the University of Utah; Stanley H. Appel, M.D., professor of neurology at Baylor College of Medicine; and Leonard T. Kurland, M.D., professor of epidemiology and medical statistics at the Mayo Clinic. All members of the panel had had previous experience in diagnosing GBS. The panel was empowered to conduct physical examinations of plaintiff, consider medical literature submitted by the parties, and review past medical records of plaintiff. Two members of the panel conducted separate examinations of plaintiff. The panel was unanimous in its conclusion that plaintiff suffered from GBS but that the time interval between the inoculation and onset of GBS, which the panel determined to be approximately eleven months, was too great for a causal nexus to exist.

Plaintiff argues that the diagnosis and treatment of GBS crosses a broad spectrum of medical disciplines and, therefore, the appointment of a panel of experts consisting of two neurologists and one epidemiologist was erroneous in that the experts' backgrounds in neurology constituted a bias in their conclusions and findings.

■ The trial judge has broad discretion in regulating trial procedure, including the appointment of a panel of experts to assist the trial court in understanding complex matters. *See Fugitt v. Jones,* 549 F.2d 1001, 1006 (5th Cir.1977). Fed.R.Evid. 706(a) provides in relevant part that

[t]he court may on its own motion or on a motion of any party enter an order to show cause why expert witnesses should not be appointed and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own selection.

Before the appointment of the advisory panel, the trial court directed the parties to discuss whether such a panel should be appointed. The parties were allowed to offer a proposed order for appointment and to suggest up to five potential panel members. The panel members were required to be available for trial and for deposition. Plaintiff deposed two of the panel members, and the depositions were admitted into evidence.

■ The diagnosis and treatment of GBS is primarily committed to specialists in neurology.[2] In undertaking its nationwide study of the incidence of GBS following the swine flu vaccination program, the CDC contacted neurologists for the collection of data with regard to the number of cases of GBS occurring in the population. The experts appointed by the trial court are well qualified in their fields. Moreover, plaintiff has failed to show the existence of any bias on the part of this panel. Under these circumstances, we find no abuse of discretion in the trial court's appointment of the panel.

■ Plaintiff's second contention on appeal is that the trial court erred in ruling that plaintiff's expert, Terrence Phillips, could not give opinion testimony regarding the causation of plaintiff's GBS. Terrence Phillips has a doctorate degree in clinical immunology. He is not, however, a medical doctor. He has a current faculty position as assistant professor of pathology and associate director of clinical chemistry at Georgetown University. Dr. Phillips was qualified as an expert witness in immunology and immunopathology. Dr. Phillips testified extensively about the laboratory tests he performed relative to plaintiff and others who had contracted GBS.

**2.** *See, e.g.,* Defendant's Exhibit K, Criteria for    Diagnosis of Guillain-Barre Syndrome.

On direct examination, Dr. Phillips admitted that he had not reviewed plaintiff's medical records because he believed that he was not qualified to render an opinion concerning a medical diagnosis. Counsel for plaintiff then posed a hypothetical question designed to elicit Dr. Phillips' opinion with regard to the relationship, if any, between plaintiff's swine flu vaccination and GBS. Defendant objected that Dr. Phillips was not qualified to give an opinion on this question. The court sustained defendant's objection based on Dr. Phillips' answers to the court's questions in which Dr. Phillips indicated that an opinion on the question of causation was a matter of medical diagnosis as opposed to "pathological diagnosis." Record, vol. XIV, pp. 35–36.

■ After the court sustained the objection, counsel for plaintiff made what he considered to be an offer of proof by merely telling the court the content of Dr. Phillips' proposed testimony. We have previously stated that such is not an offer of proof. *United States v. Brown,* 540 F.2d 1048, 1053 (10th Cir.1976). Accepting plaintiff's counsel's representation as accurate, we examine the trial court's ruling under the established principle that the admission of expert testimony is within the discretion of the trial court. *United States v. Brown, supra* at 1053; *Wolford v. United States,* 401 F.2d 331 (10th Cir.1968).

Fed.R.Evid. 702 provides that "[i]f scientific, technical, or other specialized knowledge *will assist the trier of fact* ... to determine a fact in issue, a witness qualified as an expert ... may testify thereto in the form of an opinion." (emphasis added.) In light of Dr. Phillips' admission that an opinion on causation is primarily a medical diagnosis rather than an opinion within his area of expertise, and because Dr. Phillips admitted that he was not qualified to examine plaintiff's medical records, we conclude that the trial court's exclusion of Dr. Phillips' opinion regarding causation of plaintiff's GBS was not an abuse of discretion.

■ Plaintiff's next argument is that the trial court incorrectly applied Oklahoma law in determining that proximate cause is a question of fact. Under the Federal Tort Claims Act the liability of the United States is determined in accordance with the law of the place where the alleged wrongful act or omission occurred. 28 U.S.C. § 1346(b) (1976); *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). In the instant action, plaintiff was immunized in Oklahoma and, consequently, the law of Oklahoma applies.

Under Oklahoma law, plaintiff must prove by a preponderance of the evidence that her GBS was proximately caused by the swine flu vaccine. *See Jack Cooper Transport Co. v. Griffin,* 356 P.2d 748, 752 (Okl.1959). Proximate cause has been defined by Oklahoma courts to be "that cause which in natural and continuous sequence unbroken by any efficient intervening cause produces the injury and without which the result would not have occurred." *Stout v. Rutherford,* 341 P.2d 266, 269 (Okl. 1959), *citing Wilcox Oil Co. v. Bradberry,* 208 Okl. 546, 257 P.2d 1096 (Okl.1953).

Plaintiff argues that proximate cause is more than just a question of fact. Plaintiff states that proximate cause relates to two elements: (1) causation in fact, and (2) the scope of legal responsibility. Plaintiff argues that based on policy, logic, common sense, and the facts of this case, proximate cause exists, as a matter of law, connecting the swine flu vaccination with plaintiff's GBS. Plaintiff then argues with regard to cause in fact that plaintiff's illness began immediately after the swine flu vaccination and progressed in a natural and unbroken sequence of events up to the time, one year later, when plaintiff was diagnosed as having GBS.

The Oklahoma courts have been quite clear in setting forth the appropriate standard with regard to proximate cause: "As a general rule the proximate cause of an injury is a question of fact and only becomes a question of law where the evidence together with all inferences which may be properly deduced therefrom is insufficient to show a causal connection between the alleged wrong and the injury." *Smith v. Davis,* 430 P.2d 799, 800 (Okl.1967), *quoting Leslie v.*

Hammer, 194 Okl. 535, 153 P.2d 101 (Okl. 1944); *see also Atherton v. Devine,* 602 P.2d 634, 637 (Okl.1979). We conclude that the district court set forth the proper standard under Oklahoma law for proximate cause. The threshold consideration is whether plaintiff has shown cause in fact. The district court, as trier of fact, found that plaintiff had failed to sustain her burden of proof with regard to cause in fact.

■ Plaintiff's remaining arguments challenge the trial court's factual findings on causation. Our review is therefore limited to a determination of whether the trial judge's factual findings are "clearly erroneous" under Fed.R.Civ.P. 52(a). In applying that standard, we ask whether the appellate court, after reviewing all of the evidence, is left "with the definite and firm conviction that a mistake has been committed." *Reyes v. Hoffman,* 580 F.2d 393, 394 (10th Cir.1978).

■ At the heart of plaintiff's challenge to the court's finding on causation is the contention that the trial court erred in its finding that the CDC study, Schoberger et al., *Guillain-Barre Syndrome Following Vaccination in the National Influenza Immunization Program, United States, 1976–1977,* 110 Am.J. Epidemiol. 105 (1979) ("CDC study") is "highly persuasive" that there is no causal relationship between plaintiff's swine flu vaccination and the onset of GBS. This study, conducted under the direction of Dr. Lawrence B. Schonberger, consisted of a nationwide surveillance for GBS as a result of the National Influenza Immunization Program. This surveillance uncovered a total of 1,098 patients with onset of GBS from October 1, 1976 to January 31, 1977 from all fifty states, the District of Columbia, and Puerto Rico. A total of 532 patients had recently received a swine flu vaccination prior to their onset of GBS and fifteen patients received a vaccination after the onset of GBS. Five hundred forty-three patients had not been recently vaccinated with swine flu vaccine, and the vaccination status for eight was unknown. Epidemiologic evidence indicated that many cases of GBS were related to vaccination. When compared to the unvaccinated population, the vaccinated population had a significantly higher rate of GBS in every adult age group. The estimated attributable risk of vaccine-related GBS in the adult population was just under one case per 100,000 vaccinations. The increased risk was concentrated primarily within the five week period after vaccination, although it lasted for approximately nine or ten weeks. *See* CDC Study.

The study demonstrated a direct relationship between the swine flu vaccine and the occurrence of GBS. The study has been well received in the medical community; for the most part, experts agree that the study showed a temporal relationship between the immunization and GBS.

The epidemiologic data presented in the CDC study are the results of a large cooperative surveillance effort in which health personnel from CDC and state and local health departments actively sought information from collaborating neurologists and other practicing physicians regarding their diagnosed cases of GBS within a several month period.

To counter the findings of the CDC study, plaintiff presented an unpublished critical review written by Milton Alter, M.D., Chairman of the Department of Neurology at Temple University in Philadelphia, Pennsylvania. Dr. Alter posits, with regard to the decline in the frequency of GBS after December 18, 1976, that since the immunization program was halted by then, physicians and neurologists may have felt that additional reporting was no longer germane and that the need to fill out a form could have inhibited participation. Dr. Alter suggests that the authors of the CDC study are "not in a position to comment authoritatively on whether or not a case which developed many weeks or even many months after the vaccination is causally related to the vaccination." (Plaintiff's Exhibit 2 at 3.) These criticisms notwithstanding, Dr. Alter testified that the CDC study "is undoubtedly the most definitive available on the risk of GBS from vaccination." (Plaintiff's Exhibit 2 at 4.)

Dr. Alter's criticisms form the basis for plaintiff's contention that the CDC study is not suited for nor was it intended to determine a delayed causal relationship between vaccination and the onset of GBS. The trial court found that Dr. Alter's criticisms do not undermine the validity of the study. The court further found that the CDC study "is credible evidence that GBS occurring significantly longer than ten weeks following innoculation is probably not related to the vaccine." We cannot say that this finding is clearly erroneous.

Plaintiff's final argument can be summarized as follows:

A. The report of the panel of medical experts is based on the CDC study and is therefore insufficient as an independent basis for the trial court's finding that there is no causal relationship;

B. The testimony of Dr. Robert J. Schwartzman[3] is based on the report of the panel and is likewise insufficient to negate a causal relationship; and, therefore,

C. As a matter of law, statistical evidence (*i.e.,* the CDC study) without independent, individualized supporting evidence is insufficient to rebut plaintiff's prima facie case of causation.

Initially we examine Proposition A regarding the report of the panel of experts because, if plaintiff's premises are incorrect, then plaintiff's ultimate conclusion must fall.

The findings and conclusions of the panel of medical experts were based on physical examinations of plaintiff conducted by two of the members of the panel, a review of plaintiff's medical records and the panel members' discussion of their individual findings. The panel concluded that the plaintiff's GBS developed eleven months after the swine flu injection and was therefore not causally related to the injection. It is clear that this opinion is based on more than just the CDC study. Plaintiff is thus

incorrect in her premise that the opinion of the medical experts was determined solely by the CDC study.

We affirm the judgment of the district court.

---

3. It was stipulated by the parties that Dr. Schwartzman, although unable to appear and testify in court, would concur in the findings and conclusion of the panel of experts.