727 So.2d 453 (1998)
STATE of Louisiana
v.
Jermaine DAVIS.
No. 96-KA-0872.
Court of Appeal of Louisiana, Fourth Circuit.
August 19, 1998.
Opinion Granting Rehearing December 16, 1998.
*454 Harry F. Connick, District Attorney, Orleans Parish, Karen Godail Arena, and Holli Herrle-Castillo, Assistant District Attorneys, New Orleans, for Appellee.
Clarence Roby, Jr., New Orleans, for Defendant.
Before SCHOTT, C.J., and BARRY and JONES, JJ.
SCHOTT, Chief Judge.
Defendant was charged along with two-co-defendants, Eric Laymon and Eric Rogers, with the September 23, 1993, first degree murder of Ivory Simms. On February 15, 1995, a jury found the defendant guilty as charged, but deadlocked as to the other defendants, and a mistrial was declared as to them. He filed a motion for new trial which was denied. Pursuant to the jury's recommendation he was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The principal issue on appeal is whether the prosecutor's failure to disclose Brady material violated defendant's right to due process and deprived him of a fair trial. Finding that it did, we reverse the conviction and sentence.
Lionel Burr, seventeen, testified that he was standing on the corner of General Taylor and Laurel Streets with his friend Ivory Simms and other friends when a blue car passed and then passed again with three men inside. When the car passed the second time, the man seated in the front passenger seat, whom he later identified as the defendant, began firing a .45 caliber gun. The man seated in the rear passenger seat began firing a Tech-9. At one point, the car backed up so that the occupants could continue firing. Burr was hit in the arm, groin, hip and knee, and one bullet grazed his head. Another man, Hakeen Jones, was hit, as was Simms and a six-year-old boy inside a nearby house. Burr's cousin, Derrick Williams, drove both Burr and Jones to the hospital.
At the hospital, Burr was first treated in the emergency room. While X-rays were being taken, homicide detectives arrived and showed him three sets of photographs from which he chose pictures of the defendant and *455 one of the co-defendants. Later a detective came to his house with another set of photographs from which Burr selected a picture of the other co-defendant.
Hakeen Jones testified that a black four door car appeared at the corner of General Taylor and Laurel, went around the block and returned. At that time, the car's lights went off, and shots rang out. He heard someone say "die" to Burr. He jumped off his bike and ran down an alley. He could only see the driver and the front seat occupant, although he saw two guns protruding from the back seat windows. He saw three guns in all. All of the occupants were wearing masks, but he could see the front passenger had gold teeth with diamond studs. He said he, Charles Byrd, Darnell Brown, Lydell Jones, and a set of three female triplets had just returned from a party at Audubon Park and they were all present at the scene of the shooting.
Detective Daniel Scanlan said he answered the call at General Taylor and Laurel Streets. He found Simms lying down in the street. Burr and Jones had already left for the hospital. Scanlan went to the hospital. While there, he learned that Simms had died. At the scene, he found thirteen shell casings from an automatic weapon and a box containing crack cocaine. Witnesses identified the car as a blue Chevette; and Scanlan broadcasted this description.
Detective John Ronquillo testified he found two types of casings at the scene: sixteen .9 mm shell casings and five .45 automatic shell casings. While at the scene, he learned that there had been a car accident in the St. Thomas Project involving the suspects while a police car was chasing them. Four occupants fled, and police officers could not identify any of them. Ronquillo interviewed Darryl Ross, Zacadia Scott, Lydell Jones, and Darryl Brown, all of whom told him the car the perpetrators had been driving was black. Ross had come to the crime scene after the shootings were over and told Ronquillo that he had seen four people in a black car at a Tenneco gasoline station on Magazine Street. The windows of the car were tinted, and three of the men were wearing ski masks. Scott had been at the scene and saw the arms of black men protruding from the car, firing AK type weapons and Tech-9's. He could not tell if the occupants were wearing masks. He heard the front passenger call Burr a bitch just before the shots were fired. Lydell Jones had also been at the scene and described a small black sedan. He said he did not see the faces of anyone in the car. Brown said he had seen a black Maxima or Cutlass come to the corner and stop. He saw the driver had on a black or dark blue ski mask, but did not see how many occupants were in the car. All of this information from Ross, Scott, Jones and Brown was elicited from Ronquillo testifying from a supplemental police report. None of these individuals testified at trial. Ronquillo testified that the car the suspects were driving was actually a 1985 black Pontiac T-1000, a car with a similar body style to a Chevette. It did not have tinted windows. Derrick Williams told Ronquillo that he heard that Jermaine A.K. and Lay-Lay were responsible for the shootings, although he did not witness the shootings. Ronquillo said several men in the New Orleans area are known as Jermaine A.K., including Jermaine Baker and Jermaine Cowart, and that Lay-Lay was Eric Laymon, one of the co-defendants.
Detective Kevin Honore testified he heard the broadcast of the shooting about 8:30 p.m. He began looking for four black males driving a dark car. He followed one car to Jackson Avenue and Chippewa Street, where four men exited the car and went into a store. He slowed the police car, and then heard the car carrying the suspects was a Chevrolet Chevette. Since the car these men were riding in was not a Chevette, he drove off. Then he saw a car that looked like a Chevette driving with its lights off. Three or four men appeared to be in the car. He and his partner tried to stop the car, but it sped off. The car struck another car in the St. Thomas Project, and four young black men fled from the car. The officers were unsuccessful in catching them, nor could they see the men's faces. Honore remained at the scene of the crash. About a half hour later, the defendant came up to him and said that the car belonged to him and that it had been stolen from a McDonald's restaurant at St. *456 Charles and Louisiana Avenues an hour or so before. The defendant asked to retrieve his pager from the car. Honore determined that the car, which had a temporary license plate on it, was registered to someone other than the defendant.
Detective Eric Hessler found a live bullet in the car that matched bullets found at the scene. He spoke to the defendant when he came up and claimed ownership of the car. At first, the defendant said he went to McDonald's with a friend and left the keys in the car. Then he said he went to McDonald's to visit a female friend who worked there. When Hessler asked if they could go to the restaurant to identify the girl, the defendant said that she was no longer there. Then he said no one had been with him at the restaurant. These discrepancies and contradictions caused the police to suspect the defendant of complicity in the crimes. Hessler prepared two photographic lineups and went to the hospital to interview Burr. One of the lineups had a picture of the defendant, and another had a picture of Layman. Burr was having X-rays taken, but appeared to be alert and attentive. The doctors told Hessler Burr had not been given pain medication. Burr chose the pictures of the two men.
Detective James Stewart said he also saw the bullet in the car. He found a bill of sale made out to Jerome Davis in the car and also a beeper. Stewart was there when Burr chose the pictures of the defendant and Laymon. He said Burr did not appear to be in a lot of pain and that he was coherent. The only thing he could not do was write because his hand had been injured.
Dr. Braulio Sabates, who attended Burr when he reached the hospital, testified Burr was not under sedation and was coherent. He was out of danger when the officers arrived to speak to him, and Sabates allowed them to see him. Because Burr was unable to sign the back of the pictures because of his injured hand, Sabates signed the pictures Burr had chosen. He said that if medication had been administered by the emergency room resident or the doctor who performed the angiogram, he would not have known about it, although there was no indication on the medical records that any medication had been given. He was later recalled and said Burr would definitely not have been given pain medication because the medication could have masked an injury that could have been fatal.
Defendant assigned six errors, but since three of them concerning the prosecutor's failure to disclose Brady material are dispositive of the case the others will not be discussed.
In addition to standard discovery motions filed by the defendant in this case, counsel for the co-defendants filed a subpoena duces tecum on January 13, 1995, specifically requesting "the entire, un-edited N.O.P.D. Item # H-48216-93, inclusive of all notations and additions made by the Homicide Detectives assigned to this investigation." That item was the supplemental report in which Zacadia Scott, Lydell Jones, Darryl Brown, and Darryl Ross told Ronquillo stories that conflicted with Barr's account regarding the description of the car and the assailants as set out above. The trial court ordered the report be produced to the court before January 23, 1995. The court reviewed the report and found that it contained nothing exculpatory. Then on the Monday trial began, February 13, 1995, the defense again moved for production. The trial court again ruled that the report contained nothing exculpatory. The defense sought emergency writs from this court which were denied.
The defendants sought writs from the Supreme Court, which denied a stay order, but granted writs in part, "with the trial court ordered to review the disputed supplemental police report in its entirety for Brady material. If Brady material is discovered the trial court shall order the State to produce the Brady material to defense counsel."
On the evening of the first day of trial, the trial judge reviewed the report and found it to contain nothing exculpatory except some "minor discrepancies." He made excerpts of paragraphs of the report pertaining to the four witnesses having told Ronquillo that the perpetrators were wearing masks or could not be seen and pertaining to the discrepancies as to whether the car was blue or black. *457 He said that he would allow the defense to question Ronquillo specifically about what he knew of the men and their statements. The defense moved for a mistrial which the trial court denied.
At trial on Wednesday, February 15, the trial judge allowed the defense to question Ronquillo specifically about the statements of the four men, as promised, and defense counsel actually read the excerpts of the report into the record. It then appeared that defense counsel was in fact aware of the entire report. The State argued that defense had been in possession of the report all along, and had lied to the court. Defense counsel asserted that they had only come into possession of the report at around 7:00 p.m. on Tuesday. The trial court ruled that it would accept as true the statement of defense counsel as officers of the court.
After trial, the defendant moved for a new trial on all the grounds relied on in this appeal. These three assignments relate to the State's failure to turn over Brady material, the court's refusal to order the material turned over, the denial of the motion for mistrial, and the denial of the motion for new trial.
The due process clause of the Fourteenth Amendment to the United States Constitution requires the disclosure upon request of evidence which is favorable to the accused when the evidence is material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This rule has been expanded to include evidence which impeaches the testimony of a witness where the reliability or credibility of the witness may be determinative of guilt or innocence. Giglio v. U.S., 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The Brady rule is based on due process of law. "[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial, that is, evidence favorable to the defendant which is material to guilt or punishment." State v. Rosiere, 488 So.2d 965, 970 (La.1986). The test for determining materiality was established in United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682, 105 S.Ct. at 3383. The test for determining materiality is the same whether or not the defense makes a pretrial request for exculpatory evidence. Id.
Clearly, the evidence in question was Brady material, which the prosecutor was obliged to disclose to the defense. The three defendants were on trial for first degree murder and were facing the possibility of the death sentence. The only witness identifying them as the perpetrators was Lionel Burr, a fifteen-year-old at the time of the shooting who was shot four times. According to his testimony he was standing on the corner with Ivory Simms when he saw this automobile go by and he glanced at the driver. The automobile came by a second time, it stopped, and two of the occupants began shooting at him and Ivory. Burr identified the weapon used by the front seat passenger as a .45 caliber gun and the one used by the back seat passenger as a Tech.-9. Later on he was able to identify all three perpetrators from photographic lineups even though he never saw them before in his life.
It is the jury's prerogative to weigh the kind of testimony given by Burr, and the appellate court does not ordinarily question the jury's decision in this regard. But this presupposes that the defendant had a fair trial, that he was able to make a fair defense against such testimony identifying him as the perpetrator. In this case the state dealt with him unfairly by its obstinate refusal to disclose information reported by the police early on in their investigation which information seriously undermined the reliability of Burr's identification.
The transcript of the hearing on defendant's motion to suppress Burr's identification demonstrates how unfairly the State dealt with the defendant. This hearing was held on June 3, 1994, and defense counsel attempted to cross-examine the detectives on *458 the basis of newspaper reports that witnesses on the scene said the perpetrators were wearing ski masks. The court would not permit this line of questioning because the newspaper reports were hearsay. It seems clear that counsel did not know that the detectives all the while had the names and addresses of the witnesses who made the statements reported by the newspaper. But the State knew it and failed to disclose it to the defendant.
In denying defendant's motion for a new trial the trial judge sharply criticized the prosecutor for failing to make the disclosure, but he found that the defendant was not prejudiced. With all due deference to our esteemed brother below we disagree. While it is so that the defense had the one live witness, Hakeen Jones, who stated that the perpetrators were all wearing masks and while the defense was permitted at the eleventh hour to elicit through Detective Ronquillo's testimony the report of the statements of Darryl Ross, Zacadia Scott, Lydell Jones, and Darryl Brown, we are not convinced that the trial was fair and that the defendant was not prejudiced. Had the prosecution provided the defense with this information at the outset the defendant would have been able to interview these witnesses and make an investigation early on in the prosecution. By the time the defense got the information it was too late even to subpoena them. Surely their live testimony would have provided the jury with more detailed information and would have had a greater impact on the jury than Detective Ronquillo's summary of what they told him did.
It is significant that the identification by Burr of the co-defendants in this case was exactly the same as that of defendant-appellant. Burr had never seen them before the shooting and he picked them out of photographic lineups. Yet the jury, which unanimously convicted the defendant, could not reach a verdict as to the co-defendants. The only thing different about the evidence against the defendant was his coming forward to claim his car after it was wrecked and his making statements to the police which they considered suspicious. This demonstrates that the identification standing alone was highly questionable, and the evidence if timely disclosed by the State could have produced a different result in defendant's case.
Returning to the Bagley test we conclude that the evidence withheld by the State was material because there is a reasonable probability that the result of the trial would have been different; that this is a probability sufficient to undermine confidence in the outcome of the trial.
Accordingly, the conviction and sentence are reversed and the case is remanded to the trial court for further proceedings.
REVERSED AND REMANDED.

ON REHEARING
SCHOTT, Chief Judge.
On the application of the State we granted a rehearing in order to reconsider whether the State's failure to make an early disclosure of the supplemental police report constituted a Bradyviolation to the prejudice of the defendant in violation of the due process clause of the United States Constitution.
The Brady rule requires disclosure of evidence favorable to the defendant which is material to guilt or punishment. State v. Rosiere, 488 So.2d 965, 970 (La.1986). In United States v. Bagley, 473 U.S. 667, 683, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985), the court held that evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Thus, the critical question in this appeal is whether there is a reasonable probability that defendant would not have been convicted had he been provided with the information in the supplemental police report sooner than the evening of the first day of the trial. Upon further consideration we conclude that the answer is no.
As pointed out in our original opinion, the jury had the benefit of the statements of Darryl Ross, Zacadia Scott, Lydell Jones, and Darryl Brown through the testimony of Detective Ronquillo. Of these only Brown said that any of the perpetrators was wearing *459 a ski mask at the time of the shooting, and he said only that the driver was. The jury heard the statements of Hakeen Jones that all of the perpetrators were wearing ski masks at the time. The jury apparently rejected that testimony and accepted the conflicting testimony of Lionel Burr, who identified defendant as the person who shot Ivory Sims, himself and Jones. There is no reasonable probability that the resolution of this conflict would have been different had Brown's testimony been delivered in person rather than through Ronquillo.
The only other conflicts found in the testimony of those witnesses was over the color of the automobile occupied by the perpetrators, whether black, blue, or "dark". We now accept the trial judge's characterization of this as "minor discrepancies" which did not rise to the level of exculpatory material. Even so, the jury also had the benefit of these minor discrepancies in the color of the car through Ronquillo's testimony. There is no reasonable probability that live testimony in this regard would have changed the outcome of the case.
In our original opinion we recognized that it was the jury's prerogative to weigh Burr's testimony, but concluded that the State's obstinate refusal to make a timely disclosure of the information provided by the four witnesses seriously undermined the reliability of Burr's identification. Upon reconsideration and further reflection we now conclude that our earlier conclusion was erroneous. We are satisfied that the jury's acceptance of Burr's identification of defendant as the shooter would have been no different had the State made an earlier disclosure of the supplemental police report.
In our original opinion, we stated that the only difference in the evidence against defendant and that against the other perpetrators was his coming forward to claim his car after it was wrecked and his making suspicious statements to the police. From this we concluded that the identification of defendant was questionable. However, upon reconsideration and further reflection we recognize that this conclusion was a non sequitur. The fact is that defendant's statements to the police were highly suspicious. He did not elaborate on how he knew the vehicle was wrecked or where it was, but he said that he had left his car unlocked, key in the ignition, and engine running when he went into the restaurant to eat, and when he came out the car was stolen. He originally said he was with someone at the restaurant but he could not name the person. Then he said he was visiting a female friend at the restaurant, but, again, he could not provide a name. The Officer suggested that they go to the restaurant so defendant could point the girl out and the officer could check out his story, but defendant said she was off work by then. Further questioned about the person he said was with him when he went in to eat, defendant denied being with anyone. Because of these contradictory statements and his nervous actions, defendant was given the Miranda warnings and advised he was under investigation for the murder of Ivory Sims. We now conclude that the defendant's behavior was a significant factor in the jury's decision to convict the defendant as was the fact that the police found a live .45 caliber round on the passenger side of the car where Burr said defendant was sitting, and this round matched the .45 shell casings found at the scene. This explains why the jury convicted defendant and not the others even though Burr said defendant was sitting, and this round matched .45 shell casings found at the scene. This explains why the jury convicted defendant and not the others even though Burr positively identified the others.
In our original opinion we stated that we disagreed with the trial judge who concluded that the defendant was not prejudiced because the prosecutor failed to make timely disclosure. The trial judge was surely in the better position to make this call having heard the witnesses in person and seeing the entire trial unfold. On review the appellate court must determine only if there is a reasonable probability that, had the State made a timely disclosure, the result of the trial would have been different. We now conclude that there is no such reasonable probability in this case and that the trial judge did not err in concluding that defendant was not prejudiced. Our confidence in the outcome *460 of the trial is not undermined by the prosecutor's failure to make a timely disclosure.
Because, in the original opinion, we found that the assignments of error under Brady were meritorious we did not address defendant's other assignments.
By his first assignment, defendant argues that the identification procedure in which Burr identified him was suggestive so that his motion to suppress the identification was erroneously denied. A defendant has the burden of proving that the identification was suggestive and, if so, that the suggestive procedure gave rise to a substantial likelihood of irreparable misidentification. Reliability is the linchpin in determining whether an out-of-court identification is admissible at trial. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. Smith, 596 So.2d 413 (La.App. 4th Cir.1992). In Manson, the United States Supreme Court set forth the following factors to be considered in determining whether the out-of-court identification is reliable: (1) the witness' opportunity to view the defendant at the time the crime was committed; (2) the degree of attention paid by the witness during the commission of the crime; (3) the accuracy of any prior descriptions of the perpetrators; (4) the level of the witness' certainty displayed at the time of the identification; and (5) the length of time elapsed between the crime and the identification.
In this case, the State presented evidence that Burr was the closest person to the car when the shots rang out. He was therefore in the best position to view the assailants and in fact may have blocked the view of others at the crime scene. His attention was necessarily directed at the car; he was in fact shot several times. He was certain of his identification at the time he chose the picture of the defendant, and again at trial. He made the identification the same night of the crime. Although the defendant argues that Burr was incapable of making an identification because of his condition at the hospital, all witnesses testified that he had been given no pain medication and that he was in fact coherent at the time he chose the picture of the defendant. There was no evidence presented that the officers coerced him into choosing the picture of the defendant or that they suggested to him that he choose that picture.
The defendant argues the identification was somehow not reliable because other witnesses testified that the assailants were wearing ski masks, and they could not identify the defendant. The State presented evidence that witnesses were reluctant to come forward. Furthermore, the inability of other witnesses to identify the defendant did not affect the ability of Burr to identify him, nor does it suggest that the procedure was in any way suggestive or tainted. This assignment is without merit.
By his next assignment of error defendant argues that because one of the jurors became ill after the guilty phase of the trial, but before the penalty phase, the deliberations were somehow tainted, and that the trial court erred in denying his motion for mistrial file on that basis.
The juror suffered from an asthma attack, passed out as he was awaiting transport back to the hotel after the guilty verdict had been announced, and had to be hospitalized overnight. The next day defense counsel questioned the juror who testified that his asthma had been getting worse over the course of the previous day because he had run out of medicine. The juror stated that he had experienced shortness of breath and that his heart had raced after the jury had come down to the courtroom to ask the judge a question, and then had to walk up a flight of stairs to continue the deliberations. He said, however, the symptoms were no worse than when he suffers any ordinary asthma attack. He said the stress of deliberations might have contributed to the attack, but that he had never been in a courtroom before. He explained that during the deliberations, he was able to keep himself calm to prevent the onslaught of an attack and that he was able to talk with his fellow jurors, and that he participated with them. He also explained that the jury had already decided on the fate of this defendant when they went down to ask the judge a question regarding the co-defendants. After the attack, his doctor *461 told him that he was fine except that he should not over-exercise.
The juror's testimony makes clear that although he had been suffering from asthma during the deliberations concerning the guilt of this defendant, he did not begin suffering symptoms of an attack until he returned to the jury room after the jury sought advice from the judge concerning the other defendants. The jury had in fact already determined the guilt of the defendant. There was absolutely no evidence presented that the juror suffered any illness which affected his ability to serve as a juror or participate in deliberations. He returned to deliberate on the penalty phase of the trial after a doctor had declared him well, and the jury in fact declined to sentence the defendant to death. The defendant has failed to show any prejudice whatsoever. This assignment is without merit.
The defendant next argues the court allowed the State to use its peremptory challenges systematically to strike black jurors based solely on their race, thereby violating Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In State v. Green, 94-0887, (La.5/22/95), 655 So.2d 272, the Louisiana Supreme Court discussed Batson's three-step analysis to determine whether a constitutional violation occurred:
First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.
Id. At 287.
In this case, at the time the Batson challenge was raised, the trial court noted that the defense had used twenty-one peremptory challenges, and the State had used ten peremptory challenges. Of the five jurors the parties had agreed on, two were white, two were black, and one was Hispanic. The trial court then asked the State to explain why it had exercised the peremptory challenges of which the defendant complained.
Thus, the trial court found that the defendant had established a prima facie case, and the burden shifted to the prosecutor, who was required to offer a "race-neutral" explanation for his exercise of peremptory strikes. In this case, the defense complained of the use of six specific peremptories. The court found that the State failed to offer a racially neutral explanation as to two of the prospective jurors and ordered that they be allowed to serve. As to the four others, Carolyn Polk, Emelda Jackson, Pamela Saulsberry, and Richard J. Hilliard, the court found that the State had in fact offered racially neutral explanations. As to Polk, Jackson, and Saulsberry, the State explained that they had all served on a jury that had voted not guilty in another murder trial. Polk also said that she had a job interview scheduled for the next day, and Saulsberry said she would have child care conflicts if she were forced to serve. As to Hilliard, the State explained that he had failed to make eye contact, and that he gave non-committal responses. This court has held that the State properly exercised a challenge when a juror had served on a hung jury or when a juror had been inattentive and non-responsive. See State v. McNeil, 613 So.2d 752 (La.App. 4th Cir. 1993), writ granted in part, denied in part, 623 So.2d 1320 (La.1993).
The ultimate composition of the jury and the two alternates was eight black people, five white people, and one Hispanic person. This assignment is without merit.
The defendant argues that the evidence was insufficient to support the conviction. In evaluating the sufficiency of evidence to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Heck, 560 So.2d 611, 614-615 (La.App. 4th Cir. 1990), writ den. 566 So.2d 395 (1990); State v. Jacobs, 504 So.2d 817 (La.1987).
*462 The defendant was convicted of first degree murder which is defined in R.S. 14:30(3) as the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm upon more than one person. Specific intent is the state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. R.S. 14:10(1).
In this case, the evidence presented by the State at trial provided a rational basis for the trier of fact to find beyond a reasonable doubt that the defendant was the person who killed one man when he had the specific intent to kill more than one person. Burr identified the defendant in a photographic lineup. Although other evidence suggested that witnesses said the assailants were wearing ski masks and could not be identified, the credibility of the witnesses is for the trier of fact. Other evidence in fact corroborates Burr. He testified that two types of weapons were used: a tech-nine and a .45 caliber weapon, and both types of shell casings were found at the scene. Burr was closest to the car when the shots rung out, his proximity to the car may have blocked the view of others, and the others were in fact running for cover. Furthermore, although there was some conflict over whether the car the assailants was driving was dark blue or black, the defendant claimed ownership of a car that roughly matched the descriptions given of the car. The car was involved in a traffic accident not far from the scene, minutes after the crime occurred. The defendant claimed the car had been stolen, but he gave conflicting reports concerning the events of the theft, and changed his story. A bullet matching the type of shells left at the scene was in the car.
The evidence was also sufficient to support a finding that the defendant committed the murder while acting with specific intent to kill or inflict great bodily harm upon more than one person. The evidence established that bullets and spent casings were found all over the area where many people were standing. The guns were fired into the crowd only a short distance from where the people were standing. Hakeen Jones testified that he could see the front seat passenger, the man Burr identified as the defendant, firing a gun, and that he heard the occupants say they wanted to kill Burr. Simms died of his gunshot wounds. This evidence was sufficient to support the conviction. This assignment is without merit.
Accordingly, the conviction and sentence are affirmed.
AFFIRMED.
JONES, J., dissents with reasons.
JONES, J., dissenting with reasons.
The sole question presented by the State's application for rehearing is whether the State's refusal to provide Brady material to the defendant prior to the day of trial constituted reversible error. In our original opinion, the author very eloquently stated why the State's action in withholding this Brady material was egregious conduct, and why a new trial was warranted for this defendant. Now, the majority states that, in retrospect, "we were in error." I strongly disagree.
This case simply illustrates to the country additional evidence of a prosecutor's persistent refusal to comply with the rules of law. Apparently, the policy of the Orleans District Attorney's Office, as evidenced by Kyles and other recent cases, is to refrain from disclosing any discoverable evidence, and to only present those statements of witnesses which are favorable to the prosecution. In addition to this offensive practice, the Louisiana judiciary has approved this behavior by doing precisely that which the majority does herein, condoning and rewarding Brady violations.
Once again, the State prevails by withholding the statements of witnesses whose live testimony at trial surely would have changed the outcome of this case. Interestingly, the majority supports this Brady violation by saying that there was other competent evidence to convict this defendant. Nevertheless, for this Court to permit the State to withhold Brady material, and then conclude that this defendant was afforded a fair and *463 impartial trial is without merit. For these reasons, I dissent.