756 So.2d 1160 (2000)
STATE of Louisiana
v.
Eric LAYMON and Eric Rogers.
No. 97-KA-1520.
Court of Appeal of Louisiana, Fourth Circuit.
March 15, 2000.
Rehearing Denied March 31, 2000.
*1164 Yvonne Chalker, Louisiana Appellate Project, New Orleans, Louisiana, Counsel for Defendant-Appellant, Eric Laymon.
Joseph N. Marcal, III, New Orleans, Louisiana, Counsel for Defendant-Appellant, Eric Rogers.
Harry F. Connick, District Attorney of Orleans Parish, Cate L. Bartholomew, Assistant District Attorney, New Orleans, Louisiana, Counsel for State-Appellee.
Court composed of Judge STEVEN R. PLOTKIN, Judge DENNIS R. BAGNERIS, Sr., Judge ROBERT A. KATZ.
PLOTKIN, Judge.
On October 28, 1993, Eric Rogers, Eric Laymon and Jermaine Davis were indicted for the first degree murder of twelve-year-old Ivory Simms. Rogers and Laymon pled not guilty at their arraignment on November 3, 1993; Davis did likewise on November 12, 1993. On June 3, 1994, the trial court denied defendants' motions to suppress identification, evidence and confessions. Rogers filed a motion to sever on November 23, 1994, which the trial court denied. On February 18, 1995, after a four day jury trial, Davis was found guilty as charged. The jury was deadlocked as to Rogers and Laymon, however, and a mistrial was declared for those two defendants.
After Davis' penalty phase on February 19, 1995, the jury recommended life imprisonment at hard labor. On April 3, 1995, Davis filed a motion for new trial, which the trial court denied. On the same day, Davis waived delays and was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. On appeal, this court affirmed Davis' conviction and sentence. See State v. Davis, 96-0872 (La.App. 4 Cir. 8/19/98), 727 So.2d 453, writ denied, 99-0154 (La.5/14/99), 741 So.2d 666.
The State continued its prosecution of Rogers and Laymon; and by order of the Louisiana Supreme Court, the case was transferred to the Hon. Charles Ward, Judge Ad Hoc, on January 9, 1996. Defendant Rogers filed a motion to quash due to prosecutorial misconduct on March 1, 1996; defendant Laymon later joined in this motion. After a hearing, the trial court denied the motion on April 26, 1996. After a four day jury trial, defendants were found guilty of second degree murder on May 2, 1996. Defendants filed motions for new trial and for post verdict judgment of acquittal, which the trial court denied on June 7, 1996. The trial court then sentenced defendants to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. This appeal followed.

STATEMENT OF FACTS:
At Rogers and Laymon's second trial, Lionel Burr testified that, shortly after 8:00 p.m. on August 29, 1993, he was standing on the corner of General Taylor and Laurel Streets with Ivory Simms and some of his other friends. Burr was approximately fifteen years old at the time. A dark blue, four-door car occupied by three men passed the corner, turned out of sight, and then approached again. As the car passed the second time, the man in the front passenger seat began firing a .45 caliber gun, and the man in the rear passenger seat began firing a Tech-9. At one point, the car backed up so that the passengers could continue firing. Burr was hit in the arm, groin, hip and knee, and one bullet grazed his head. Another young man, Hakeem Jones, was hit in the leg, as was six-year-old Pedro Anderson, who had been inside a nearby house. Ivory Simms was found fatally wounded one block from the scene of the attack. He died at the hospital later that night.[1]
*1165 Hakeem Jones testified that he had gone to a party in a park earlier that day and had returned to the neighborhood with friends. He was standing with them by a house near the corner and was eating ice cream when a black, four-door car without tinted windows appeared at the corner of General Taylor and Laurel, went around the block, and returned. The car's lights went off, and shots rang out after Jones heard someone say "die B" to Burr. Jones testified that the two shooters were wearing ski masks[2] and that the front passenger had a shorter gun than did the rear passenger.[3] Jones ran down an alleyway but was hit in the leg. He stated that Lionel Burr had been closer to the car at the time of the shooting than he had been and also stated that it was fairly dark at the time and that no street lights were on.
Zacadia Scott testified that he was present near the corner when the shooting began and reacted by diving under a parked car. He could not remember whether the perpetrators were masked and could not say how many of them were in the car.
Lydell Jones testified that he had spoken with the police about the shooting, but he stated that he had not seen anything and had not even heard the gunshots. He denied telling the police that a small, black sedan drove by and began shooting.
Detective Daniel Scanlan testified that an emergency call relating to the shooting was made at 8:19 p.m. He was in the area at the time and responded very quickly. He found Simms and requested an emergency medical unit and backup assistance. At the scene, he found numerous shell casings from an automatic weapon and a box containing a substance resembling crack cocaine. Witnesses identified the car as a blue Chevette, and Scanlan broadcast this description. By this time, Lionel Burr and Hakeem Jones had been taken to the hospital by Burr's cousin, Derrick Williams, and mother. Det. Scanlan relocated to the hospital to interview the two victims and obtained their personal information. He stated that he did not succeed in obtaining descriptions of the perpetrators; however, neither victim stated that the perpetrators were masked during the attack. Det. Scanlan subsequently learned that Ivory Simms had died; and his investigation then ceased, as he was required to defer to the homicide division.
Detective Kevin Honore testified that he and his partner, Keith Williams, heard the broadcast of the shooting and description of the car at approximately 8:30 p.m. Det. Honore followed one car but determined that its occupants were not involved in the shooting. He then saw a car resembling a Chevette being driven with its lights off, even though it was then dark. The car was headed downtown, coming from the direction of the St. Thomas housing development. Three or four men appeared to be in the car, and he and his partner tried to stop it. After a brief chase, during which the officers radioed for assistance, the car struck another car in the 800 block of St. Mary Street; and four young black men abandoned the car and ran. The officers were unable to apprehend or identify any of them, nor did they see any weapons during the course of either the car or foot chase.
Det. Honore remained at the scene of the crash. Approximately thirty minutes later, Jermaine Davis approached him, stating that the car belonged to him and that it had been stolen from a McDonald's restaurant at St. Charles Avenue and Toledano Street earlier that evening. Davis asked if he could retrieve his pager from the car. Honore determined that the car, *1166 which had a temporary license plate, was registered to someone other than Davis. He had no further conversation with Davis, who was kept at the scene for further questioning.
Sergeant Eric Kesler and Det. Jimmy Stewart assisted Detective John Ronquillo in the homicide investigation. After hearing of the car chase and crash, they went to the 800 block of St. Mary Street. Sgt. Kesler found a live .45 bullet in the car. Sgt. Kesler also spoke to Jermaine Davis, who said first that he went with a friend to a McDonald's at St. Charles and Louisiana Avenues and left the keys in the car. Davis then said that he went to McDonald's to visit a female friend who worked there. When Sgt. Kesler asked if they could go to the restaurant to identify the girl, Davis said that she was no longer there. Then Davis said that no one had been with him at the restaurant. These discrepancies and contradictions caused the police to suspect, correctly, that Davis had been involved in the attack.[4]
Officer Larry Couhig testified that he responded to Det. Honore's call for assistance in pursuing the suspicious vehicle and arrived at the crash site. A dispatch was then received, prompting Officer Couhig and three or four other officers to travel less than one block to 805 St. Andrew Street, which, it was later discovered, was the home of defendant Laymon's sister. Officer Couhig testified that he was between two courtyards behind a building when bystanders began pointing and officers began running through the courtyards; Officer Couhig then came up a driveway to intercept someone being chased. The officer observed a young black man, wearing dark clothing, run into an abandoned building. At the same time, he heard a woman yell, "That's my son!". Because of this exclamation, and because he lacked a flashlight, Officer Couhig did not enter the building. The woman approached Officer Couhig and identified herself as Gwendolyn Laymon. The officer relayed information from his conversation with Mrs. Laymon to the homicide detectives. Officer Couhig participated in the arrests of Eric Laymon, on the following day, and of Eric Rogers, four days later.
Gwendolyn Laymon, Eric Laymon's mother, testified that, at approximately 9:00 p.m. on the night in question, she was sitting on the porch of her daughter's residence at 805 St. Andrew Street. She testified that the police approached and asked her to view the crashed car, which she had never seen before. Mrs. Laymon denied approaching the officers that night and denied yelling "That's my son!". She did state that she knew Eric Rogers and that his nickname was "Weanie."
Sgt. Kesler then prepared two photographic lineupsone with a picture of Davis, another with a picture of Laymon and went to the hospital to interview Burr. Burr had initially been treated in the emergency room; he later underwent an angiogram to determine whether he had suffered severe damage to his circulatory system. The procedure was completed by approximately 12:10 a.m. on August 30th. Burr was laying on a gurney in the X-ray room but appeared alert and attentive. Doctors told Sgt. Kesler that Burr had not been given any pain medication. In the course of the interview, Burr selected the pictures of Davis and Laymon at 12:15 a.m. and 12:20 a.m., respectively. Burr named Laymon as the driver of the car and Davis as the front passenger. Due to his wounds, Burr marked an "X" on each photograph; and his attending physician, Dr. Braulio Sabates, witnessed the procedure by signing the back of each marked photograph.
Later that night, at approximately 2:30 a.m., Sgt. Kesler and other officers searched Davis' mother's residence. They *1167 recovered a box of shotgun shells, some.380 bullets, and a few photographs. None of these items was connected to the attack; however, the officers confiscated them because they were not yet sure what kinds of bullets had been found at the crime scene.
Dr. Sabates, who attended Burr when he reached the hospital, testified that Burr was coherent during the course of his treatment. Burr had sustained several gunshot wounds but had stabilized when the officers arrived to speak with him, so Dr. Sabates allowed them to see him. Because of Burr's hand injury, Dr. Sabates signed the chosen pictures as a witness. Dr. Sabates testified that Burr had not received pain medication prior to the detectives' interview because it could have masked a serious internal injury. Dr. Sabates did note that Burr had admitted to using marijuana in the past, though not necessarily on the night@ in question.
Meanwhile, beginning at approximately 8:45 p.m. that night, Detective Carlton Lawless processed the crime scene. He recovered six spent .45 casings; sixteen spent 9mm casings; and the gold box containing the cocaine-like substance.[5] He also collected blood samples, Ivory Simms' clothing, and spent bullets that struck 3828 and 3830 Laurel Street. Finally, he processed the vehicle abandoned on St. Mary Street, recovering a live .45 bullet.
Officer Kenneth Leary, a firearms examiner with the New Orleans Police Department Crime Lab, examined the spent casings and bullets found at the crime scene. He testified that all six spent .45 caliber casings were fired from the same weapon and that nine of the sixteen 9mm casings were fired from the same weapon. The markings on the other seven 9mm casings were insufficient to determine whether they were fired from the same weapon. He also determined that two recovered 9mm bullets were fired by the same weapon. Because the .45 bullet found in the abandoned car was never fired, Officer Leary could not test it; however, he noted that the casing of that bullet was made by the same company that made five of the six .45 casings recovered at the crime scene. Finally, Officer Leary explained that a Tech-9 fires 9mm bullets and that, barring custom modifications, automatic guns eject casings in an rearward-right arc.
Detective John Ronquillo led the homicide investigation in the case. He interviewed Darryl Ross, Zacadia Scott, Lydell Jones, and Darnell Brown. Det. Ronquillo testified that the abandoned car was actually a dark blue 1985 Pontiac T-1000, which has a body-style like that of a Chevette. The car did not have tinted windows. Det. Ronquillo testified that eight fingerprints were lifted from the Pontiac, but none were suitable for comparison; nor were any found on the recovered casings. Det. Ronquillo participated in a search of the homes of Eric Laymon's mother and sister, but he found nothing relating to the shooting.
On September 2, 1993, Detective Ronquillo presented a photographic lineup containing Eric Rogers' picture to Lionel Burr at Burr's home. Burr identified Rogers as the third suspect, the rear passenger. Burr was still unable to sign his name due to his injuries and placed an "X" on the back of the photograph; his aunt witnessed the procedure and signed the back of Rogers' picture. Det. Ronquillo did not show lineups to anyone else in the course of his investigation.
Defendant Eric Rogers testified on his behalf and denied any involvement in the shooting. He stated that he had never seen Lionel Burr before the case began. He testified that, from 8:00 p.m. to 10:00 p.m. on August 29th, he was watching a movie on television with his girlfriend, Beatrice Preston; they were living together at 4604 South Robertson Street.[6] Rogers *1168 stated that he was with Preston during the night of the 28th and the entirety of the 29th. At approximately 8:00 that morning, Rogers and Preston went to Preston's grandmother's house and remained there with more of Preston's relatives. At some point, Rogers went to a store and bought a sandwich. He and Preston stayed at her grandmother's house while a parade was passing. When the parade was over, he and Preston were taken home by his mother, Verna Rogers, and his "stepfather," Oliver Perkins, in a Roland cab. Rogers stated that Perkins was a cab driver for the Roland company.
Rogers testified that he learned he was a suspect in the murder when, a few days after the shooting, his mother showed him a card she had received from the police. Rogers decided to surrender and began the process by going to his lawyer's office. His lawyer contacted the police, who arrested Rogers at the office. Rogers testified that the police brought him to the Sixth District station on Felicity Street and interrogated him for an hour, despite contrary instructions given by his lawyer. Rogers stated that one officer was drinking beer and drew his service revolver from its holster. Another officer showed Rogers a "cop killer" bullet and told him that he was going to throw his gun to him and that Rogers should catch it. Nothing further transpired, however, and Rogers was brought to central lockup.
With regard to his relationships with Eric Laymon and Jermaine Davis, Rogers stated that he had known Laymon since sixth grade and Davis since 1990.[7] They all lived in the St. Thomas development, and he spoke with both men but did not spend time with them. However, Rogers admitted that he had been with Laymon on August 29th but did not say when they had been together. He knew that Laymon's nickname was "Bunny" and stated that Mrs. Laymon would know his own nickname, "Weanie."
Verna Rogers, Eric Rogers' mother, testified that she learned her son was wanted by the police on September 5, 1993, when she saw his name in the newspaper. Rogers told her that he was not involved in the shooting, and they decided to see a lawyer. They saw a lawyer, who notified the police, and Rogers was subsequently arrested.
At the time of the shooting, Mrs. Rogers was living at 2530 Cadiz Street, which is very close to 4604 South Robertson Street, where Eric Rogers was living with Beatrice Preston. She called for and saw her son at 6:30 a.m. on the 29th while she was leaving for work. Mrs. Rogers saw her son again around 7:00 that night; he was in a Morrison cab with Preston. Oliver Perkins, who was not married to Mrs. Rogers, was not driving the cab; and Mrs. Rogers did not speak to her son as the cab was passing, nor did she know where he was going. Mrs. Rogers stated that did not know all of the people with whom her son associated, but she did know Laymon ("Bunny") and Davis due to their living in the area.
Betty Jean Green, a friend and neighbor of the Rogers family, stated that she saw Eric Rogers and Beatrice Preston some time after 6:00 p.m. on the 29th. Ms. Green saw Rogers and Preston pass in a cab while she was speaking with Rogers' mother outside of the latter's house. After Rogers went home, presumably to 4604 South Robertson, he came toward his mother's house. Ms. Green spoke briefly with Rogers, who then entered his mother's house. Rogers' sister, Lisa, had been at Mrs. Rogers' house earlier but had left because she was upset about something. After talking with Mrs. Rogers for about an hour, Ms. Green returned to her own home. She did not see Eric Rogers further that night.
Lisa Rogers, Eric Rogers' sister, testified that she saw her brother at approximately *1169 3:00 p.m. on August 29th at or near her friend's house on Laurel Street.[8] She did not see Beatrice Preston with him. Ms. Rogers saw her brother again around 7:00 p.m., when he was in a cab with Preston; and she telephoned her mother's house around 7:30 p.m. and spoke to her brother for a few minutes because she had been angry with him for some reason.
Michael Smith, a prison inmate, testified that he knew Jermaine Davis, Eric Laymon and Eric Rogers. He testified that he had heard about the shooting but saw nothing related to it because he was in jail by that time. Smith denied having a recorded conversation with Rogers' attorney at the prison in which he stated that he had seen the car chase following the attack. Smith stated that he had been incarcerated for manslaughter since July 30, 1993; however, the parties stipulated that the arrest register for Michael Smith stated that Smith was not arrested for a second degree murder charge until October 31, 1993.[9]

ERRORS PATENT:
A review of the record for errors patent reveals none.

LAYMON'S ASSIGNMENT OF ERROR NO. 1; ROGERS' ASSIGNMENTS OF ERROR NOS. 2-8 AND 12[10]:
Defendants contend first that the State failed to produce exculpatory evidence, allegedly found in a supplemental police report, in a timely manner.
The due process clause of the 14th Amendment to the federal constitution requires the disclosure upon request of evidence which is favorable to the accused and is material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This rule has been expanded to include evidence which impeaches the testimony of a witness where the witness' credibility may be determinative of guilt or innocence. Giglio v. U.S., 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Because the Brady rule is based on due process of law, "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial, that is, evidence favorable to the defendant which is material to guilt or punishment." State v. Rosiere, 488 So.2d 965, 970 (La.1986). The test for determining materiality was established in U.S. v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985): "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." The test for determining materiality is the same whether or not the defense requests any exculpatory evidence. Id.; see also Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995) ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, *1170 understood as a trial resulting in a verdict worthy of confidence.")
In the present case, defendants attempted to obtain the supplemental police report prior to their first trial in 1995, arguing that it contained exculpatory statements made by witnesses to the shooting. The trial court reviewed the report but found no exculpatory evidence, prompting defendants to seek supervisory writs. Finding no error, this court denied defendants' writ application. State v. Laymon, 95-0348 (La.App. 4 Cir. 2/10/95), unpub. Defendants then sought review from the Louisiana Supreme Court, which granted the writ in part and ordered the trial court to review the supplemental police report for Brady material again. State v. Laymon, 95-0353 (La.2/13/95), 653 So.2d 550. The trial court again found no exculpatory evidence but did allow defense counsel to read excerpts from the reportstatements made to Det. Ronquillo by Lydell Jones, Darryl Ross, Zacadia Scott and Darnell Browninto the record in the course of examining Det. Ronquillo. "Of these only Brown said that any of the perpetrators was wearing a ski mask at the time of the shooting, and he said only that the driver was." Davis, 727 So.2d at 458-59. The other witnesses' statements only contained discrepancies as to whether the vehicle was blue or black. Id. At the second trial, both Zacadia Scott and Lydell Jones testified during defendants' case.
Defendants do not deny that the introduction of the statements at the first trial benefited them to a degree. Instead, they argue that the State's withholding of the report, which contained the witnesses' names and addresses, prohibited them from developing testimony that would have been much more effective in challenging Lionel Burr's credibility. Defendants aver that the State's withholding of the report prevented them from contacting those witnesses during the period between the shooting (1993) and the first trial (1995), a period of approximately one and a half years. They contend that, during this period and the period between the first and second trials, beneficial testimony became stale and ineffective. "Over a year passed between the first and second trials. Memories faded, if not changed. Witnesses refused to appear and testify. They did not want to become involved. This may have been different had the state complied with its obligation and presented the defense with this exculpatory information in a timely manner." Brief for Appellant Laymon at 19.
In essence, then, defendants argue that the withholding of the report before the first trial has irrevocably prejudiced them, preventing them ever from receiving a fair trial in this matter. Defendants accordingly argue that due process demands the reversal of their convictions and, presumably, a bar against future prosecution.
Initially, we note that "the late disclosure, as well as the non-disclosure of exculpatory evidence can so prejudice a defendant that he is deprived of his constitutional right to a fair trial...." State v. Landry, 388 So.2d 699, 702 (La.1980), cert. denied sub nom Landry v. Louisiana, 450 U.S. 968, 101 S.Ct. 1487, 67 L.Ed.2d 618 (1981). However, the declaration of a mistrial in the 1995 trial suggests that that trial was fair and did not violate defendants' due process rights. The question before us then becomes whether defendants' second trial was fair. In considering this question, we are mindful both of defendants' claims regarding the staleness and unavailability of witness testimony and the fact that they had access to the alleged Brady material for one year prior to the second trial.
This latter fact is particularly harmful to defendants' claims. Defendants had a fair opportunity to procure and interview witnesses prior to the second trial, as the appearances by Lydell Jones and Zacadia Scott indicate. The trial court's power to compel testimony via subpoenas was available for this purpose. And assuming that the problem of stale testimony did affect defendants' case, it may have affected the *1171 State's case as well. In sum, given that defendants were able to find and present more testimony than they presented at their first trial, it does not appear that the State's earlier withholding of the report led to an unfair second trial.
Moreover, there is persuasive authority for the proposition that the proper remedy for a Brady violation is a new trial at which the defense has access to the withheld material. In State v. Brooks, 551 S.W.2d 634 (Mo.Ct.App.1977), cert. denied sub nom Brooks v. Missouri, 434 U.S. 1017, 98 S.Ct. 736, 54 L.Ed.2d 763 (1978), the defendant was indicted for robbery and assault and convicted after a trial in 1972. However, the conviction was reversed on appeal, prompting a new trial that was held in 1974. Due to improper commentary by the prosecution, a mistrial was granted; and a third trial was held in 1975, after which the defendant was convicted again. In one of his assignments of error in the subsequent appeal, the defendant contended that the trial court erred in not granting a judgment of acquittal in the first two trials because he had not been given the benefit of a witness' grand jury testimony which partially conflicted with the witness' testimony at the 1972 and 1974 trials. The witness did not testify at the 1975 trial and was thus not cross-examined about his grand jury testimony.
"The thrust of these contentions," the Missouri Court of Appeals wrote, "is that the defendant should be discharged and these proceedings be reversed because the State failed to provide the defense with the grand jury testimony ... prior to the 1972 trial and thus violated the principles of due process under the principles of [Brady v. Maryland]." 551 S.W.2d at 654. The court found no merit in the defendant's contentions, though, and in the following relevant passage wrote:
[A]ssuming that the testimony of [the witness] in the 1972 and 1974 trials was contradictory and inconsistent with his grand jury testimony, the failure to provide favorable evidence would not, as appellant contends, entitle him to a complete discharge. In none of the decisions [citing, inter alia, Brady and Giglio] which has [sic] dealt with the suppression issue was the defendant entitled to an outright discharge. In the event of failure to disclose favorable evidence a defendant at most is entitled to a new trial. But appellant had a new trial in 1974 and at that time he had the grand jury testimony. [The witness] was cross-examined concerning it. That trial ended in a mistrial at the conclusion of the State's case. Appellant was then tried again in 1975. Hence he was furnished with such testimony and the principles of Brady and its progeny were not violated.
We conclude that the appellant is not entitled to be discharged.
Id. at 655 (emphasis added).
Similarly in the instant matter, defendants had access to the disputed material not only for part of their first trial but also for one year prior to their new, second trial. In effect, the mistrial and award of a new trial cleansed any prejudice that had accumulated against defendants; and we therefore do not find a reasonable probability that the outcome of the second trial would have been different if the evidence had been disclosed at an earlier time prior to the first trial.[11]
These assignments of error are without merit.

LAYMON'S ASSIGNMENT OF ERROR NO. 2; ROGERS' ASSIGNMENT OF ERROR NO. 13:
Defendants next argue that the trial court erroneously denied their motions to *1172 suppress the identifications made by Lionel Burr. Defendants suggest that Burr was in great pain and/or on pain medication when he made the identifications and, thus, that the identifications were unreliable. Defendants also question the police officers' procedures, contending that the procedures were suggestive.
This court stated the law pertaining to out-of-court identifications in general, and photographic identifications specifically, in State v. Sterling, 96-1390, pp. 3-4 (La.App. 4 Cir. 11/13/96), 684 So.2d 74, 75-76, as follows:
The defendant bears the burden of proving [1] that an out-of-court identification itself is suggestive, and [2] that there was a likelihood of misidentification as a result of the identification procedure. State v. Lee, 94-2584 (La.App. 4 Cir. 1/19/96), 668 So.2d 420, writ denied [,] 96-0477 (La.5/10/96), 672 So.2d 919. An identification procedure is unduly suggestive if it focuses attention on the defendant. State v. Davis, 27,961 (La.App. 2 Cir. 4/8/96), 672 So.2d 428. Even a suggestive out-of-court identification will be admissible if it is found reliable under the totality of circumstances. State v. Guy, 95-0899 (La.App. 4 Cir. 1/31/96), 669 So.2d 517, writ denied, 96-0388 (La.9/13/96), 679 So.2d 102.
If the photographic identification is found to be suggestive, it must be determined whether, under all the circumstances, the suggestive procedure gave rise to the substantial likelihood of irreparable misidentification, for it is the likelihood of the misidentification which violates due process, not merely the suggestive identification procedure. State v. Nguyen, 95-1055 (La.App. 5 Cir. 3/26/96), 672 So.2d 988, writ denied, 96-1019 (La.10/4/96), 679 So.2d 1377.
The United States Supreme Court set forth a five-factor test to determine whether an identification is reliable: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. Cockerham, 95-0172 (La.App. 4 Cir. 3/14/96), 671 So.2d 967, writ denied, 96-1257 (La.10/25/96), 681 So.2d 363. Also to be considered under the totality of circumstances is the deterrent effect on police behavior so the police will guard against unnecessarily suggestive procedures for fear that their actions will lead to the exclusion of identifications as unreliable. Manson v. Brathwaite, supra.
(Emphasis added.)

Identification of Eric Laymon
Eric Laymon contends that the lineup containing his photograph, shown to Burr four hours after the shooting, improperly focused attention on him because he is the only man in the lineup with "distinctive" eyebrows. On cross-examination, Sgt. Kesler, who prepared the lineup, agreed that Laymon was the only one in it with distinctive eyebrows. Having reviewed the lineup, we also agree that Laymon's eyebrows are unusual because they are intermittently shaven, giving the impression of vertical stripes. However, this detail is only apparent when one deliberately compares the subjects' eyebrows; a generalor even closecomparison of the photographs reveals nothing suggestive as to Laymon.[12] Other differences in the lineup are more distinctive with regard to some subjects other than Laymon. For example, one man is wearing a bright, red shirt with white writing partially visible. Another man's hands are prominent as he holds the identifying placard before him, and another man is thrusting his chin defiantly *1173 upward and forward. In sum, the composition of the lineup does not distinguish the picture of Laymon from the rest; we do not find the lineup itself suggestive.
Laymon criticizes not only the lineup itself, however, but also the way in which it was shown to Lionel Burr. Appellate counsel specifically notes the following contradiction in the testimony presented by the State: Sgt. Kesler testified that he laid all six photographs on a metal bedside table and that Burr looked at them while laying on his side; however, Burr and Dr. Sabates testified that Burr was in fact unable to lay on his side and that Sgt. Kesler accordingly held up the photographs one by one as Burr was laying on his back. Defense counsel thus argues that, despite Sgt. Kesler's testimony that he in no way attempted to influence Burr, the sergeant had the opportunity to display the picture of Laymon (and, in the other lineup, that of Jermaine Davis) for a longer period of time, thus making its selection by Burr more likely.
We agree that Sgt. Kesler had the opportunity to hold the picture of Laymon (and of Jermaine Davis) for a suggestive length of time. The conflict between Sgt. Kesler's account of the identification procedure and Burr and Dr. Sabates' account could be viewed as one factor tending to support a conclusion that this opportunity became realityor it could simply be viewed as a conflict created by an imperfect memory. The importance of deterring law enforcement officers from engaging in unnecessarily suggestive procedures could be another factor, as noted in Manson v. Brathwaite, supra. However, to reach confidently the conclusion that defense counsel proposes, we would have to make three difficult assumptions: (1) that the sergeant intendedfor reasons unknown to influence Burr and jeopardize the lives of Laymon and Davis; (2) that the sergeant's attempt to influence Burr was blatant enough to overpower Burr's natural hesitancy in making an erroneous identification yet subtle enough to escape notice; and (3) that the sergeant continued his improper activity by concealing it under oath.
The governing principle for this issue is that the defendant bears the burden of proving the suggestiveness of an identification procedure. State v. Lee, supra. Defendant Laymon has raised a possibility that the identification procedure employed in this case was suggestive; and reviewing the totality of the circumstances, we have tried to determine whether that possibility could be confidently said to have become reality. On the record before us, however, we cannot make the assumptions stated above. Because there is insufficient evidence to conclude that Sgt. Kesler actually attempted to influence Lionel Burr's identification, we hold that Laymon has not carried his burden of proving the suggestiveness of the identification procedure.
Moreover, even if the lineup and/or display of it to Burr were held to have been suggestive, Laymon would still bear the burden of proving that the identification was unreliable. Because Burr identified Laymon and Davis at approximately the same time, this court's Manson analysis of the reliability of Burr's identification of Davis is also appropriate here:
In this case, the State presented evidence that Burr was the closest person to the car when the shots rang out. He was therefore in the best position to view the assailants and in fact may have blocked the view of others at the crime scene. His attention was necessarily directed at the car; he was in fact shot several times. He was certain of his identification at the time he chose the picture of the defendant, and again at trial. He made the identification the same night of the crime. Although the defendant argues that Burr was incapable *1174 of making an identification because of his condition at the hospital, all witnesses testified that he had been given no pain medication and that he was in fact coherent at the time he chose the picture of the defendant. There was no evidence presented that the officers coerced him into choosing the picture of the defendant or that they suggested to him that he choose that picture.
State v. Davis, 727 So.2d at 460.
By way of elaboration, we note that Burr was standing very close to the street when the attack occurred. In fact, he testified that he was, at the closest point, approximately three feet from the car. He was easily able to identify the kinds of guns that were used. Because the car did not have tinted windows, he could see clearly inside of it. Due to daylight savings time, the sun was setting when the attack occurred; even though it was after 8:00 p.m., it was not yet dark. Because the car passed once before the attack occurred, Burr had the opportunity to see the perpetrators twice.[13] Burr did not, however, give detailed descriptions of the perpetrators. He stated that they were all black males, seventeen to twenty years old, with close-cropped hair; and he added that the front shooter (Davis) had two gold teeth. At the time of trial, Burr did not recall whether the driver (Laymon) turned to look at him or whether he continued looking ahead.
The facts that Burr was very close to the perpetrators, that he identified Laymon just four hours after the attack, and that he identified the perpetrators quickly and with certainty weigh in favor of reliability. On the other hand, the uncertainty surrounding Burr's look at the perpetrators when they first passed, the rapidity of his second encounter with them, and his limited descriptions of them weigh against it. Perhaps the most significant factor, however, is that Burr correctly identified Jermaine Daviswhose involvement in the incident has been establishedminutes before he identified Laymon. In these circumstances, the reliability of the first identification bolsters the reliability of the second.[14]
In sum, we hold that Laymon did not prove that the identification of him was suggestive; nor, even if it were suggestive, does it appear to have been proven unreliable. A trial court's ruling on the admissibility of identification evidence is entitled to great deference and will not be reversed barring an abuse of discretion. State v. Bickham, 404 So.2d 929 (La.1981). Finding no abuse of discretion, we hold that Laymon's second assignment of error is without merit.

Identification of Eric Rogers
Eric Rogers seems to argue only that Lionel Burr's identification of him is unreliable, adopting by reference in his brief the arguments made in Laymon's brief. Essentially, then, Rogers challenges Lionel Burr's ability to have made a competent identification of him.[15]
*1175 On September 2, 1993, Det. Ronquillo went to Burr's home, where Burr was recuperating, and presented Burr with a photographic lineup including a picture of Rogers. Burr selected Rogers' photograph from the lineup. As Burr could still not write, he marked an "X" on the back of Rogers' photograph; and Burr's aunt, who was present during the procedure, signed the back of it.
The circumstances surrounding Burr's identification of Rogers are the same as those surrounding his identification of Laymon, with the following exceptions. First, Burr identified Rogers as the rear shooter in the car, perhaps enabling Burr to see him more clearly, since he would have been closer to Burr and certainly facing him. Additionally, if one combines the testimony of Officer Leary as to the way in which casings are generally ejected by automatic weapons with the fact that no casings were found in the abandoned Pontiac, one may infer that the rear shooter was not simply firing from within the car but may have been leaning toward, if not out of, the open rear window. Second, Burr was taking pain medication and antibiotics prior to Det. Ronquillo's visit, whereas he had not been prior to his identification of Laymon. However, Burr testified that he did not feel impaired during his identification of Rogers; and Det. Ronquillo and Burr's aunt should have been able to observe any unusual behavior by him. Finally, there is the time difference, as three and a half days passed between the shooting and the identification of Rogers. However, our jurisprudence reveals that this time period is not great enough to affect the reliability of the identification negatively. See State v. Smith, 596 So.2d 413, 416 (La.App. 4 Cir. 1992) (no "corrupting effect" from eleven day lapse); State v. McPherson, 630 So.2d 935, 941 (La.App. 4 Cir.1993) (lapse of "only five days"); State v. Cockerham, 671 So.2d at 973 (lapse of seven days); State v. Nguyen, 672 So.2d at 993 (lapse of six months did not overcome other factors).
In sum, because Rogers did not prove that the identification of him was suggestive and unreliable, the trial court did not abuse its discretion in denying his motion to suppress. This assignment of error is without merit.

LAYMON'S ASSIGNMENT OF ERROR NO. 3; ROGERS' ASSIGNMENTS OF ERROR NOS. 9 AND 14:
Defendants next suggest that the trial court erred by forbidding them from introducing expert testimony concerning eyewitness identifications. Defendants wished to call Dr. Everett Morse, an alleged expert in eyewitness identification, who would have testified to the traumatic nature of the shooting and its effect on Lionel Burr's ability to make accurate identifications.
The Louisiana Supreme Court in State v. Stucke, 419 So.2d 939 (La.1982), ruled against the admission of expert testimony relative to eyewitness identifications.[16] The Court considered the issue as res nova in Louisiana and reviewed jurisprudence from other states. The Court stated:
Although our research has revealed no cases where the issue of the acceptance of expert testimony regarding eyewitness identification has arisen in Louisiana, we have noted such cases in other jurisdictions. In State v. Ammons, 208 Neb. 797, 305 N.W.2d 812 (1981), the *1176 Supreme Court, in a case which involved a robbery, affirmed the trial court's refusal to allow a psychologist to testify to prove that eyewitness identification testimony tends to be inaccurate and unreliable. The trial court held that the prejudicial effect of the testimony outweighed its probative value, that the issue was not a proper subject for expert testimony and that the evidence would usurp the function of the jury. The Supreme Court further noted that the accuracy or inaccuracy of eyewitness observation is a common experience of daily life and such testimony would invade the province of the jury.
The Supreme Court of Nevada considered this issue in Porter v. State, 94 Nev. 142, 576 P.2d 275 (1978), which involved a prosecution for robbery where defendant offered testimony from a clinical psychologist to challenge the validity of the eyewitness identification. The trial court rejected the testimony on the grounds that the proffered testimony was not in a recognized field of expertise, the foundation was inadequate, and it would invade the province of the jury. The appellate court affirmed the rejection on the basis that there was no express showing that the witness would have addressed himself to the testimony of the victim with reference to the victim's retention and recollection capacity, the effect of stress (if any) on the victim's power of perception or other relevant considerations. Rather, he would have testified about the unreliability of eyewitness accounts in general. The court further concluded that there existed a substantial risk that the potential persuasive appearance of the expert witness would have had a greater influence on the jury than the evidence presented at trial, thereby interfering with the province of the jury.

United States v. Brown, 540 F.2d 1048 (10th Cir.1976), involved another situation where a defendant was charged and convicted of taking money from an FSLIC institution by force and violence by the use of a pistol. The trial court refused to permit defendant's expert witness to testify to the limitation and weakness of lay eye-witness identification. The witness offered was a psychologist who had conducted studies of eye-witness identification and problems of perception. The court therein stated:
Generally, expert testimony, while not limited to matters of science, art or skill, cannot invade the field of common knowledge, experience and education of men. 3. Am.Jur.2d, Expert and Opinion Evidence, § 21; 100 A.L.R.2d 1421, 92 A.L.R. 1223. Put another way, the test of admissibility is often predicated upon the proposition that opinion evidence cannot usurp the functions of the jury or be received if it touches the very issue before the jury. Frase v. Henry, 444 F.2d 1228 (10th Cir.1971); Wigmore on Evidence, Third Ed., Vol. VII, §§ 1920, 1921; 31 Am.Jur.2d, Expert and Opinion Evidence, § 22.
* * * * * *
In United States v. Brown, 501 F.2d 146, 150 (9th Cir.1974), reversed on other ground[s], United States v. Nobles, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (decided June 23, 1975), the Court said:
Nobles offered the testimony of Dr. Robert Buckhout as an expert witness to describe the problems of eyewitness identification in general and the specific difficulties with the identifications in this case. The court refused the proffered testimony, concluding that the testimony would invade the province of the jury, that the undue consumption of time would substantially outweigh its probative value, and *1177 that the offer of proof was inadequate. We in turn cannot conclude that the trial court was in error. United States v. Amaral, 488 F.2d 1148 (9th Cir.1973).
We, too[,] cannot conclude in the case at bar that the trial court erred. (540 F.2d at 1054.)
It should be noted that the testimony in United States v. Brown, 501 F.2d 146 (9th Cir.1974), sought to be admitted was from the same expert offered in the instant case on behalf of the defendant.
The rationale expressed in the foregoing cases is equally applicable to the instant case. We conclude that the prejudicial effect of such testimony outweighs its probative value because of the substantial risk that the potential persuasive appearance of the expert witness will have a greater influence on the jury than the other evidence presented during the trial. Such testimony invades the province of the jury and usurps its function.
We therefore conclude that the trial court did not abuse his discretion in failing to allow the expert witness to testify. The testimony sought to be elicited from him would not have been an aid to the jury. We further conclude for the reasons contained herein that the trial court did not err in denying defendant's motion for a proffer of the evidence.
Stucke, 419 So.2d at 944-945.
This court, in State v. Gurley, 565 So.2d 1055 (La.App.4 Cir.1990), writ denied, 575 So.2d 386 (La.1991), likewise held that the trial court did not abuse its discretion in refusing to allow expert testimony on the reliability of eyewitness identifications. The Second Circuit has also followed Stucke and affirmed a trial court's decision not to allow such expert testimony. See State v. Coleman, 486 So.2d 995 (La.App. 2 Cir.1986), writ denied, 493 So.2d 633, 634 (La.1986).
The twelve jurors in this case were presented with myriad reasonsall perfectly understandable by laymenwhy they should not credit the identifications made by Lionel Burr. The trial court could have reasonably decided, under La. C.E. art. 403, that any benefit from the proffered testimony would have been outweighed by its creation of confusion and/or undue prejudice. Considering Stucke and Gurley, we hold that the trial court did not abuse its discretion in refusing to allow the testimony. These assignments of error are without merit.

LAYMON'S ASSIGNMENT OF ERROR NO. 4; ROGERS' ASSIGNMENTS OF ERROR NOS. 10 AND 15:
Defendants next argue that the trial court erroneously refused to allow them to impeach Michael Smith's testimony by introducing into evidence an audiotaped statement allegedly made by Smith to one of defendants' attorneys. Defendants contend that Smith told defense counsel that he saw the police chasing Davis' vehicle on the day of the shooting and also saw four men jump out of Davis' car after the crash. Smith testified at trial, however, that he had already been incarcerated when the shooting occurred and only heard about it from other people. Defendants then sought to introduce the taped statement into evidence as a prior inconsistent statement. The trial court refused to allow defendants to play the taped statement to the jury.
In State v. Cousin, 96-2973, pp. 7-10 (La.4/14/98), 710 So.2d 1065, 1069-70, the Supreme Court discussed the admissibility of such out-of-court statements:
Generally an out-of-court statement... is inadmissible as hearsay. La. Code. Evid. art. 802. However, La. Code Evid. art. 801 D(1)(a) classifies as non-hearsay a prior statement of a witness *1178 at trial that is inconsistent with the witness' trial testimony and was given under oath at the preliminary examination or prior trial of the accused. This classification, of course, has very limited applicability.
Nevertheless, La. Code Evid. art. 607 D(2) permits the introduction of a prior inconsistent statement, even though it is inadmissible hearsay, for the limited purpose of attacking the credibility of a witness. Although such evidence is admissible for impeachment, this court has steadfastly recognized that "when a witness other than the defendant is impeached by the admission of a prior inconsistent statement incriminating the defendant, the statement is admissible only on the issue of credibility and not as substantive evidence of the defendant's guilt." State v. Ray, 259 La. 105, 249 So.2d 540, 542 (1971). [Other citations omitted.]
This long-standing jurisprudential rule is further buttressed by La.Code Evid. art. 105, which provides in part as follows:
When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.

See also George W. Pugh et al., Handbook on Louisiana Evidence Law 367 (1997), recognizing that "the prior inconsistent statements of a non-party witness... may be employed only to attack the witness's credibility, and not for their truth value."
* * * * *
When the Louisiana State Law Institute proposed the Louisiana Code of Evidence to the Legislature, the substantive impeachment rule was even further restricted. Only those inconsistent statements that were given in "the accused's preliminary hearing or ... prior trial [where the] witness was subject to cross examination by the accused" are classified as non-hearsay and admissible as substantive evidence. La. Code Evid. art. 801 D(1)(a). Otherwise, prior inconsistent statements are only admitted to impeach or to contradict the witness's trial testimony, i.e., solely to discredit the witness; these statements cannot be used to divulge the content of the prior statement for the purpose of inviting the jury to believe the content of the statement. La. Code Evid. art. 607 D(2).
Before extrinsic evidence of a prior inconsistent statement is admissible, the proper foundation must be laid. This foundation requires that the time, place and circumstances in which the statement was made be called to the witness's attention and that the witness be given opportunity to admit or deny having made the prior statement. The witness's denial of making the prior statement completes the foundation. State v. Nedd, 93-1906 (La. App. 1 Cir. 11/10/94), 647 So.2d 346, 350. The statement is admissible as impeachment evidence but may be excluded by the La. C.E. art. 403 balancing test. See La. C.E. art. 613.
In this case, defendants sought to introduce the tape to prove that Smith made a statement to defense counsel that would exculpate defendants. While Smith admitted that he spoke with defense counsel, he denied making the statement to defense counsel that he saw the car chase and the persons who fled from the car after it crashed. Smith testified instead that he was in jail at the time of the shooting. Defense counsel argued at trial that he wanted to introduce the statement to prove that Smith saw Davis and three other passengers jump out of the vehicle. Defense counsel stated at trial, outside the jury's presence, that he asked Smith specifically *1179 about the incident and wanted Smith to tell the truth. Defense counsel asked the trial court if he could, for the record, "describe the scenario in his court seeing Germaine [sic] Davis and three other passengers pile out of the car." As defendants sought to introduce the statement to prove the truth of the matter assertedi.e. that persons other than defendants fled from the carintroduction of it would have been improper under Cousin and the jurisprudence reviewed therein. Moreover, defendants were able to impeach Smith's credibility when it was stipulated thatcontrary to Smith's testimony on direct examinationSmith was not arrested for second degree murder until October 31, 1993, two months after the shooting. Therefore, any admission of the statement would most likely have been used "for inviting the jury to believe the content of the statement." Cousin, 710 So.2d at 1070.
We accordingly hold that the trial judge did not err in barring the taped statement. These assignments of error are without merit.

LAYMON'S ASSIGNMENT OF ERROR NO. 5; ROGERS' ASSIGNMENT OF ERROR NO. 16:
Defendants next contend that the State failed to produce sufficient evidence to support their convictions for second degree murder.
In State v. Ash, 97-2061 (La. App. 4 Cir. 2/10/99), 729 So.2d 664, writ denied, 99-0721 (La.7/2/99), 747 So.2d 15, this court summarized the standard of review that applies when a defendant claims that the evidence produced to convict him was constitutionally insufficient:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and, if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305 (La.1988). Additionally, the reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. Id. The trier of fact's determination of credibility is not to be disturbed on appeal absent an abuse of discretion. State v. Cashen, 544 So.2d 1268 (La.App. 4 Cir.1989). When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proved such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Although defendants were charged with first degree murder, the jury found them guilty of second degree murder. La. R.S. 14:30.1 defines second degree murder in pertinent part as "the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily *1180 harm." Specific intent is the "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1).
Eric Laymon, identified as the driver of the shooters' car, could also be convicted under the rule of principals. "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." La. R.S. 14:24.
In this case, it was established that Ivory Simms was killed by gunfire in a sudden, drive-by attack. The perpetrators' specific intent could be inferred from the manner of the attack itself. Defendants do not dispute these points but rather argue that the State failed to introduce sufficient evidence of their identity. Alternatively, they argue that, because the State produced no physical evidence linking them to the shooting, their convictions should not stand solely on Lionel Burr's identification of them.
Lionel Burr testified that Laymon was the driver of the vehicle and that Rogers was the rear passenger, and he identified them in court. If credible, this testimony was sufficient to support defendants' convictions. See State v. Allen, 94-1895, p. 7 (La.App. 4 Cir. 9/15/95), 661 So.2d 1078, 1084, writ denied, 95-2557 and 95-2475 (La.2/2/96), 666 So.2d 1087. And, with regard to Rogers' conviction, the jury could not credit Burr's testimony unless it rejected Rogers' alibi testimony and Hakeem Jones' testimony that the perpetrators were masked.[17] Although the defense vigorously challenged Burr's testimony, memory and demeanor, the jury nevertheless found his identifications credible. The jury similarly found Rogers' and Jones' testimony not credible. The jury thereby fulfilled its purpose of resolving conflicts in testimony. An appellate court, reviewing only a cold record, may not usurp this crucial function. State v. Harris, 624 So.2d 443 (La.App. 4 Cir. 9/16/93), writ denied, 93-2609 (La.6/24/94), 640 So.2d 1339; Ash, supra. Finally, Rogers testified that he knew both Davis and Laymon and that he was with Laymon at some point on August 29th. Viewing the record in the light most favorable to the State, we find that a rational jury could have found Rogers guilty of second degree murder beyond a reasonable doubt.
Similarly, Lionel Burr's testimony was sufficient to support a conviction of Laymon. Particularly damaging to Laymon is the fact that Burr identified his picture from a photographic lineup at approximately the same time that he selected Jermaine Davis's picture from a separate lineup.[18] As a minor fact in support of the jury's conclusion, Rogers testified without contradiction that Laymon was with him on the 29th. Finally, Officer Couhig testified that, while pursuing a young man who was fleeing from the police in the vicinity of the abandoned Pontiac not long after the car chase, Mrs. Laymon approached and yelled "That's my son!". Mrs. Laymon denied that this occurred, thus creating *1181 another conflict for the jury's resolution.[19] Again viewing the totality of the evidence in the light most favorable to the State, we hold that a rational jury could have found Laymon guilty as a principal in the crime of second degree murder.
The fact that the State presented no physical evidence linking defendants to the shooting does not alter this analysis. Credible testimony that identifies a defendant as a perpetrator is direct evidence of guilt. Allen, supra. As discussed above, despite hearing testimony that any identification of the perpetrators would have been impossible, all twelve jurors found Lionel Burr's testimony credible. Additionally, we have held that defendants failed to prove that the identification process and reliability of the identifications were violative of their due process rights. We therefore find these assignments of error to be without merit.

ROGERS' ASSIGNMENTS OF ERROR NOS. 11, 17 AND 18:
In his final assignments of error, Rogers argues that the trial court erroneously denied his motions for new trial and post verdict judgment of acquittal, which he filed immediately after the second trial. Rogers argues that he is entitled to a new trial because of new evidence presented after trial, namely that Rogers assisted the State in identifying the perpetrators in two other murder cases. Rogers contends that the State agreed to drop the charges in this case in exchange for that assistance. A motion hearing was conducted in the trial court's chambers on June 7, 1996. The trial court denied Rogers' motion for post-verdict judgment of acquittal or, in the alternative, motion for new trial, and Rogers objected.
While defendant argues the issue of newly discovered evidencei.e. his cooperation with the policeat the appellate level, this argument was not addressed in the written motions filed in the trial court. In his motion for post-verdict judgment of acquittal or, in the alternative, motion for new trial, defendant contended that the evidence was insufficient to support his conviction. Defendant also argued that prosecutorial misconduct prevented him from having a fair trial. The alleged prosecutorial misconduct occurred in relation to the State's alleged failure to provide defendant with the supplemental police report. These two issues have been addressed above and have been found to be without merit.
Considering the issues raised in defendant's written motion for post verdict judgment of acquittal or, in the alternative, motion for new trial, the trial court did not err in denying defendant's motions. And because defendant did not raise the issue of newly discovered evidence in his written motion before the trial court, it is not properly before this Court. See La. C.Cr.P. arts. 852, 856.
Rogers also contends that the trial court erred in denying another motion for new trial, filed on July 1, 1999, which urged that there was newly discovered evidence. Defendant specifically points to his discovery that the transcript of the in-chambers hearing conducted on June 7, 1996, was missing. And, indeed, Daryl Duplessie certified on September 14, 1998, that the notes of Joseph Catalano, the court reporter, have been lost.[20]
*1182 La.C.Cr.P. article 851 provides that a motion for new trial should be granted when "[n]ew and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at trial it would probably have changed the verdict or judgment of guilty." A denial of a motion for new trial will not be disturbed absent a clear abuse of discretion. State v. Williams, 580 So.2d 497 (La.App.4 Cir.1991), writ denied, 585 So.2d 566 (La.1991).
The Louisiana State Constitution provides that "[n]o person shall be subjected to imprisonment ... without the right of judicial review based upon a complete record of all evidence upon which the judgment is based." La. Const. Art. I, Sec. 19 (West 1977). In addition, La.C.Cr.P. art. 843 requires that all of the proceedings in a felony case be recorded. However, where missing portions of the trial record are not evidentiary, their absence does not compromise the defendant's constitutional right to a judicial review of the entirety of the evidence. State v. Thomas, 92-1428, pp. 2-3 (La.App. 4 Cir. 5/26/94), 637 So.2d 1272, 1274, writ denied, 94-1725 (La.11/18/94), 646 So.2d 376, cert. denied sub nom Thomas v. Louisiana, 514 U.S. 1054, 115 S.Ct. 1437, 131 L.Ed.2d 317 (1995). In State v. Tucker, 95-0030 (La. App. 4 Cir. 9/18/96), 682 So.2d 261, this court held that, because the full transcript of the evidentiary portion of the trial was available, the absence of the jury instruction transcript did not deny defendant full appellate review.
Defendant argues on appeal that he presented evidence of his assistance to the State in other murder cases at the motion hearing on June 7, 1996 and that the State subsequently agreed to drop the charges against him in this case. Defendant made this argument at the hearing held on October 1, 1999, but as stated above, did not present it in his written motions filed with the trial court on that day.
The absence of transcript from the in-chambers hearing held on June 7, 1996, does not prejudice defendant's right to a complete judicial review of the record concerning his conviction and sentence for second degree murder. Defendant cannot logically argue that events occurring after the trial influenced the verdict against him; and the issues contained in the initial motion for post verdict judgment of acquittal or, in the alternative, motion for new trial, have been considered in the present appeal and found to be without merit.
Additionally, the record does not otherwise support defendant's contention that the transcript included a discussion about his alleged assistance to the State. At the hearing held on October 1, 1999, the State did not indicate that any arrangements had been made concerning defendant's alleged assistance. Moreover, if an agreement had existed prior to trial, then defendant should have sought relief through a motion to quash.[21] Defendant's failure to file a motion to quash on this particular issue prior to trial and/or to object during trial suggests that the alleged agreement did not exist prior to the rendering of the verdict. And once the verdict had been rendered, a motion for new trial would not have been an appropriate remedy. Finally, regardless of when defendant entered into the alleged agreement with the State, defendant has not indicated that, as a precautionary *1183 measure, it was ever memorialized in writing.
This assignment of error is also without merit. For the reasons stated above, defendants' convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] A trail of blood led from the corner of General Taylor and Laurel to Ivory Simms' body. Dr. Richard Tracy, a forensic pathologist with the Orleans Parish Coroner's Office, performed an autopsy on Simms, who sustained one gunshot wound to the chest and one to the abdomen. The former wound was fatal.
[2] The State questioned Jones about his testimony recorded in the first trial, at which Jones testified that the front passenger and driver were the ones wearing ski masks. Jones stated that the recordation of his earlier testimony was incorrect.
[3] This testimony is consistent with Burr's, as the rear shooter's Tech-9 would have been longer than the front shooter's .45 firearm.
[4] Keys, a beeper and a bill of sale in favor of Jermaine Davis were all found in the crashed car.
[5] The box of cocaine was found on the side of the street opposite that where the casings were found.
[6] At one point during the trial, defense counsel indicated that Beatrice Preston was in the hallway outside of the courtroom. However, the trial continued, and Preston never testified.
[7] Rogers was eighteen years old at the time the shooting occurred.
[8] Lakisha Rogers, Lisa Rogers' daughter, also testified to seeing Eric Rogers at this place and time. She also testified that the Calvin triplets told her that they had heard the gunshots. The trial court ruled inadmissible anything else that the Calvin triplets may have told Lakisha Rogers. All three tripletsIeysha, Ineyshia and Ternishiatestified that they heard gunshots as they were alighting from the family truck but saw nothing. They denied that another vehicle was following their truck prior to the attack.
[9] We note, for the sake of clarity only, that Eric Laymon did not testify or present alibi witnesses.
[10] Defendant Rogers did not argue his first assignment of error in his appellate brief. Therefore, it is deemed abandoned and will not be considered on appeal. State v. Bray, 548 So.2d 350 (La.App. 4 Cir.1989); Rule 2-12.4, Uniform RulesCourts of Appeal. Rogers' assignments of error are grouped in accordance with the manner of their presentation in his original brief.
[11] Our conclusion is supported by the fact that, assuming that the State had suppressed the report entirely, that defendants had been convicted in 1995 and that their convictions had been reversed, defendants would have received a new trial and the report. Due to the mistrial, defendants received this very remedy.
[12] Additionally, Lionel Burr never described any of the perpetrators as having distinctive eyebrows. He presumably would not, then, have been looking for such a feature.
[13] It is not clear that Burr took full advantage of the first opportunity, however. Burr stated that he did get a good look at the occupants when they passed the first time. On cross-examination, though, defense counsel introduced the transcript of the first trial, during which Burr stated that he and his friends did not pay much attention to the car when it first passed. Burr insisted, though, that he did see the occupants when they passed the first time and did not recall saying he was not paying attention to it.
[14] The only response to this statement available to the defendant seems to be that Sgt. Kesler must have influenced Burr's identification of both Jermaine Davis and himself. But again, the occurrence of such influence has not been proven to be anything other than speculation.
[15] During the trial, defense counsel argued that the lineup with Rogers' picture was suggestive because, in his picture, Rogers is wearing a shirt with the words "Just Win Baby" on it. The State responded that at least some of the other subjects were wearing shirts with writing or logos on them. To the extent that defendant has not argued that the lineup was suggestive, we must consider that issue abandoned. State v. Bray, supra.
[16] Stucke was decided prior to the enactment of the Louisiana Code of Evidence; however, Stucke "is consistent with the Louisiana Code of Evidence articles regarding expert testimony." State v. Ford, 608 So.2d 1058, 1061 (La.App. 1 Cir.1992).
[17] The jurors may or may not have credited the testimony of Mrs. Rogers, Ms. Rogers and Ms. Green, whose testimony only corroborated Rogers' alibi in part, since none of them could account for his whereabouts after 7:30 p.m. The jury may also have noted the conflicting testimony of Eric Rogers and Mrs. Rogers: the former testified that he and Beatrice Preston came home in a Roland cab driven by Oliver Perkins and also occupied by Mrs. Rogers; the latter testified that Eric Rogers and Preston came home in a Morrison cab not driven by Perkins and without her in it.
[18] Again, Sgt. Kesler would have had to have influenced Burr's identifications of both Davis and Laymon for this statement to be questioned.
[19] Mrs. Laymon's credibility was perhaps undermined, though, when defense counsel, referring to the incident in closing arguments, stated that Mrs. Laymon was attempting to protect her son at the time.
[20] A procedural clarification must be made. Also on July 1, 1999, defendant filed a motion to remand with this court on to allow the trial court to consider his new motion for new trial. This court initially denied the motion to remand on September 21, 1999. However, after being advised that the trial court considered and denied the motion for new trial on October 1, 1999, this court (retroactively) granted the motion to remand on October 6, 1999. Then, because the trial court had already denied the motion for new trial, this court ordered defendant to file his appellate brief within twenty days of the signed order.
[21] Defendant did file several pre-trial motions to quash based on other issues.